EGBERT C. SMYTH *vs.* VISITORS OF THE THEOLOGICAL IN-STITUTION IN PHILLIPS ACADEMY IN ANDOVER.

TRUSTEES OF PHILLIPS ACADEMY *vs.* ATTORNEY GENERAL & others.

Essex.　October 14, 15, 1890. — October 28, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Andover Theological Seminary — Visitors — Board of Trustees.*

While under the original act (St. 1780, c. 15) incorporating the " Trustees of Phil-lips Academy at Andover," the trustees are constituted the sole visitors of the corporation, it is not inconsistent with the design of the founders of the Acad-emy that such trustees should accept and manage, under the authority of a legislative act (St. 1807, c. 22), donations for a different but kindred purpose, and permit supervision of their conduct in this department by a board of vis-itors appointed by the donors.

The visitors of the Andover Theological Seminary, in taking original proceedings to remove a professor therein charged with teaching erroneous doctrines, act in a strictly visitatorial capacity, and the board of trustees of that institution are entitled, if they so desire, to be made a formal party to such proceedings, and to have an opportunity to be heard. (FIELD, C. J., dissenting.)

THE FIRST CASE is an appeal by Egbert C. Smyth, under the St. of 1823, c. 50, § 3, to the full court, from a decree of the Board of Visitors of the Theological Institution in Phillips Academy in Andover, removing the appellant from the office of Brown Professor of Ecclesiastical History in that institution. The sec-ond case is a bill in equity filed in this court by the Trustees of Phillips Academy against the Attorney General, and against such visitors as a board and individually, and against the appellant,

for instructions as to the effect and validity of the decree of the Visitors above referred to. *Field*, J. reserved the second case, on July 10, 1889, for the consideration of the full court. The facts in the two cases, so far as material to the points decided, appear in the opinions.

The cases were argued at the bar in October, 1890, and afterwards, in September, 1891, were submitted on the briefs and printed arguments to all the judges.

*C. T. Russell, T. W. Dwight* (of New York), *& S. E. Baldwin* (of Connecticut), ( *W. Gaston & C. H. Barrows* with them,) for the appellant.

*E. R. Hoar, A. French, & A. H. Wellman*, for the Visitors.

*G. O. Shattuck & J. C. Gray,* ( *T. H. Russell & R. R. Bishop* with them,) for the Trustees.

KNOWLTON, J.   The Theological Institution in Phillips Academy in Andover has a peculiar organization.   In 1778 the Academy was founded by Samuel Phillips and John Phillips, " for the purpose of instructing youth, not only in English and Latin grammar, writing, arithmetic, and those sciences wherein they are commonly taught, but more especially to learn the great end and real business of living," and was placed under the control of a board of trustees.   On October 4, 1780, this board was incorporated by an act of the State of Massachusetts Bay as " The Trustees of Phillips Academy," with a view to accomplish more successfully the purpose of the original founders.   The act provides that these trustees " and their successors " shall " be the true and sole visitors, trustees, and governors of the said Phillips Academy, in perpetual succession forever," and gives them power to make such laws, orders, and rules as to them seem best.   They are authorized to receive gifts, and to hold them " on such terms, and under such provisions and limitations, as may be expressed in any deed or instrument of conveyance to them made," provided that the condition of the grant or donation does not require them " to act, in any respect, counter to the design of the first grantors, or of any prior donation."   St. 1780, c. 15, § 5, 5 Prov. Laws, (State ed.) 1418.   By the last will of John Phillips, proved and allowed on April 18, 1795, one third of the residue of his property was given to the Trustees of Phillips Academy, " for the benefit more especially of charitable scholars"; and it was

provided that those who expected to become clergymen might be assisted in the study of divinity by " some eminent Calvinistic minister of the Gospel."   By the St. of 1807, c. 22, the corporation is authorized to hold " for the purpose of a theological institution, and in furtherance of the designs of the pious founders and benefactors of said academy," real and personal estate, the income of which is to " be always applied to said objects, agreeably to the will of the donors, if consistent with the original design of the founders of the said academy."   Afterwards, in the same year, Phœbe Phillips and others established and endowed " a public theological institution in Phillips Academy," · on the condition that it " be accepted by the trustees aforesaid, and that it be forever conducted and governed by them and their successors in conformity to" certain "general principles and regulations," which they unitedly adopted as the constitution of the institution.   Under this constitution and the preceding legislative act of the same year, the theological institution became a department of Phillips Academy, the management and control of which were in the corporation, under regulations or statutes which were set out at length in the instrument creating it.   The trustees were charged with the duty of conducting the institution in conformity with the wishes of the donors as expressed in these regulations, and elaborate provisions were made prescribing methods of management.   At the same time, certain visitatorial powers were reserved to the founders in Article 32 of the instrument, which is as follows: " Notwithstanding this seminary is placed by this constitution under the immediate care and government of the Trustees of Phillips Academy, it is always to be understood, and it is hereby expressly declared, that every founder of a professorship, scholarship, or any other living whatever in this institution, will have the exclusive right of prescribing the regulations and statutes to be observed by the said trustees in conducting the concerns of the same, said regulations and statutes being always consistent with the principles and object of this institution; and also the right, for the term of his life, of appointing in the original deed or grant such local visitor or visitors as he may think proper, and to endow him or them with all visitatorial powers and authorities necessary to secure and enforce due observance

and execution of his said regulations and statutes." This was the original foundation of the Theological Institution in Phillips Academy.

In 1808, Moses Brown and others gave a fund of forty thousand dollars to the corporation, the income of which is to be applied to the maintenance of two professors in the theological institution, and by certain elaborately drawn instruments they prescribed the terms on which the gifts were made, and the manner in which they were to be used. These gifts were accepted by the trustees, and the regulations for the management of them are entitled "The Statutes of the Associate Foundation in the Theological Institution in Andover," or "The Associate Statutes." In May, 1808, in pursuance of a power reserved by them in the original constitution, the original founders, Phœbe Phillips and others, by additional regulations, brought the original statutes into conformity with the associate statutes in all important particulars.

In general character the statutes of the associate foundation differ but little from the original statutes. They leave the whole management and control of the theological institution in the board of trustees, who constitute the corporation, and who hold the property, subject only to a visitatorial power in the board of visitors, whose general duty is to visit the corporation and see that the trustees manage the institution in conformity with the statutes, and, if errors or abuses are discovered, to correct them; and subject also to a right and duty on the part of the visitors to take original supervisory action in two or three matters in the management, as in the examination of professors prior to their inauguration, and in the approving or negativing the election of a professor by the trustees, and in appointing a standing committee to ascertain the qualifications of applicants for admission to the seminary.

The first part of Article 12 of the associate statutes is as follows: "That the trust aforesaid may be always executed agreeably to the true intent of this our foundation, and that we may effectually guard the same in all future time against all perversion, or the smallest avoidance of our true design as herein expressed, we, the aforesaid founders, do hereby constitute a board of visitors to be, as in our place and stead, the guardians,

overseers, and protectors of this our foundation in manner as is expressed in the following provisions," etc.   By Article 20 it is. provided that "the power and duties of the board of visitors thus constituted and organized shall be as follows, namely: to visit the foundation once in every year, and at other times when regularly called thereto; to inquire into the state of this our fund, and the management of this foundation, with respect both to professors and students; to determine, interpret, and explain the statutes of this foundation in all cases brought before them in their judicial capacity; to redress grievances, both with respect to professors and students; to hear appeals from decisions of the board of trustees, and to remedy, upon complaint duly exhibited, in behalf of the said professors or students; to review and reverse any censure passed by said trustees upon any professor or student on this foundation; to declare void all rules and regulations made by the said trustees relative to this foundation which may be inconsistent with the original statutes thereof; to take care that the duties of every professor on this foundation be intelligibly and faithfully discharged, and to admonish or remove him either for misbehavior, heterodoxy, incapacity, or neglect of the duties of his office; to examine into the proficiency of the students, and to admonish, suspend, or deprive any student for negligence, contumacy, or any heinous crime committed against the laws of God or the statutes of this foundation; and, in general, to see that our true intentions as expressed in these our statutes be faithfully executed; always administering justice impartially, and exercising the functions of their office in the fear of God, according to the said statutes, the constitution of this seminary, and the laws of the land."

The powers and duties of the trustees in regard to the affairs of the corporation remain as prescribed by the original act of incorporation and the amendatory act, and by the original constitution of the theological institution, except so far as they are abridged or modified by the associate statutes.

We have before us two cases, — one the appeal of Egbert C. Smyth from the decree of the Visitors of the Theological Institution in Phillips Academy in Andover, removing him from his office as Brown Professor of Ecclesiastical History, the other a bill in equity, brought by the Trustees of Phillips Academy

against the Attorney General and others, asking for the determination and instruction of the court in regard to the validity of the above mentioned decree of the visitors.

It is contended by the appellant in the former case, and by the plaintiff in the latter case, that the provision for a board of visitors in the associate statutes is inconsistent with the act of incorporation of the Trustees of Phillips Academy, and invalid, and that the statute of 1823, c. 50, incorporating the board of visitors, is unconstitutional and void. We are of opinion that this contention is not well founded. While by the original act the trustees are constituted the sole visitors of the corporation, we think it is not inconsistent with the design of the founders of the academy that they should accept and manage, under the authority of a legislative act, donations for a different but kindred purpose, and should permit supervision of their conduct in this department by a board of visitors appointed by the donors. The validity of these statutes, and of the act incorporating the board of visitors, seems to have been settled by adjudications of this court. *Phillips Academy* v. *King*, 12 Mass. 546. *Murdock, appellant*, 7 Pick. 303. *Murdock* v. *Phillips Academy*, 12 Pick. 244.

At the hearing before the board of visitors on the complaint of J. W. Wellman and others against Egbert C. Smyth and four others, professors in the theological seminary in Andover, upon which complaint the decree appealed from is founded, the trustees applied for leave to appear and be heard as a party, and their application was rejected. Again in this court the trustees have asked to be heard in that suit; and they contend that the decree of the visitors should be set aside because it was made without hearing them, and they make a like contention and argument in their suit in equity. The question which they present involves an inquiry into the nature of visitatorial proceedings in general, and into the relations of the visitors to the managing board of the corporation under the statutes of the founders of the theological institution in Phillips Academy.

The nature of the duties of visitors of educational or charitable institutions is to some extent implied in the name which these officers bear. They are to visit the corporation. They are to go where it is, and see it and its representatives face to face.

2 Kent Com. (13th ed.) 302.    *The King* v. *Bishop of Ely*, 1 Wm.
Bl. 71, 82.    *Eden* v. *Foster*, 2 P. Wms. 325.    Their visitation is
for the purpose of inquiring into its condition, and ascertaining
whether it is properly or improperly managed, and whether in
all respects it is conducted according to the principles of its foun-
dation.    A visitation may be general or special; and under most
English foundations, to protect the managing board from too fre-
quent interference, a general visitation can only take place at
the expiration of a certain interval, as one, three, five, or ten
years.    Following this theory, the Andover statutes prescribe
that general visitations shall be once in a year.    Associate Stat-
utes, Art. 20.    A special visitation may be made at any time at
the request of the governing body, or of any one claiming a
grievance against it, and who on that account has a right to
promote the office of the visitors.    When special duties are im-
posed on the board of visitors by the founder, the visitors may
perform them at such times as required by the statutes which
confer their authority.    Ordinarily at a special visitation the
managing body of the institution is necessarily a formal party
before the visitors, because the visitation proceeds on a formal
application by the managers, or by some one asking relief against
them.    When questions arise at a general visitation, whatever
the form of the proceedings, the real party whose conduct is on
trial is the managing board, by reason of whose act or omission
the institution is alleged to have gone astray.    Although the
visitors are not a court, in the performance of some of their
duties they act judicially, and they must be governed by the will
of the founder as expressed in his statutes.    It is a fundamental
principle of all judicial proceedings that one whose conduct is
called in question shall be heard in his defence, and this prin-
ciple is as important in its application to the managing board of
a charitable corporation whose acts or omissions are under inves-
tigation by a board of visitors as to an individual charged with
the commission of a crime.    *Murdock, appellant,* 7 Pick. 303.
*Murdock* v. *Phillips Academy,* 12 Pick. 244.    It is inconceivable
that a board of visitors intending to be governed by principles
of justice should for a moment think of refusing the managing
body a hearing in a case where the proceedings are directly
against it to set aside its action.    But it should not be forgotten

that almost everything which comes within the jurisdiction of a board of visitors acting under their general visitatorial power involves a trial of the managing board, and the jurisdiction of the visitors to deal with the agents or servants or individual beneficiaries of the institution is, ordinarily, merely incidental to their jurisdiction over the institution itself as represented by its managing officers. If by the statutes they are given express authority to act in a visitatorial capacity in regard to an agent, their action may no less directly affect the institution itself. The form of the proceeding is immaterial; if the visitors are in fact seeking to revise the action of the managers by virtue of their supervisory power, the managers should have an opportunity to be heard.

So far as the industry of counsel on either side has furnished us with authorities, we have found nothing to indicate that visitations of educational or charitable institutions, under foundations like that which we are considering, have ever been had without notice to the managing board. In some relations, under the ecclesiastical system in England, the bishop has visitatorial power of a different kind, which we need not consider; but in institutions like the theological department of Phillips Academy the right of the managing board to be heard before the visitors in every proceeding affecting the corporation seems to have been always assumed. In *The King* v. *Bishop of Ely*, 2 T. R. 290, 336, 338, 345, in considering the question whether a visitor acted in his official capacity, Ashhurst, J. said: " But even supposing that this matter was within the bishop's visitatorial authority, yet he has not acted in the character of a visitor. The exercise of a visitor's power, in a case like the present, is a judicial act; and a judge cannot determine without hearing the parties concerned. So that even if he had the right to exercise such a power, he should have done it in a formal manner, and should at least have convened the parties interested, to give them an opportunity of making a defence." Buller, J. used the following language: " His proceedings therefore have not even the show of a visitation; for whenever that is intended, the parties whose conduct or whose rights are objected to should be heard or at least convened before him, and have an opportunity of being heard; but in the present instance this ceremony was totally omitted."

Grose, J. said: " Neither did he himself conceive that he was acting as visitor; his acts show that he was not; and he acted without giving notice to the persons on whom he was judging." Not only is this language applicable in terms to the governing board of a corporation whose conduct is called in question, but the facts of that case show that the judges had reference to the governing board of Peterhouse College, to whose action the controversy related. In those cases under royal charters, where the visitatorial power is in the King, visitatorial proceedings in regard to the management of the affairs of the corporation have been conducted before the Lord Chancellor, who has observed the same rules as to bringing before him all parties interested as in ordinary cases in chancery; and every reason that exists in any case why parties interested in a proceeding should have a right to be heard applies in cases like the present.

The counsel for the trustees asserted at the argument that it had been the universal practice in England for visitors to give notice and an opportunity of being heard to the managing body before making a decree affecting the management of an eleemosynary institution, and they offered to present affidavits showing the result of extended researches in regard to the subject; but, the respondents objecting, and the facts not being regularly before us as evidence, we have considered only such cases as appear in the reports or come within general historical knowledge. These indicate that the practice in England has been as contended by the trustees. *Philips* v. *Bury*, 2 T. R. 346; *S. C.* 1 Ld. Raym. 5. *The King* v. *Bishop of Ely*, 2 T. R. 290. *Attorney General* v. *Dixie*, 13 Ves. 519. *Attorney General* v. *Earl of Clarendon*, 17 Ves. 491.

It cannot be maintained that the visitors are the corporation that holds the property and is primarily responsible for the affairs of the seminary, or that they sufficiently represent the corporation when sitting as judges. They are incorporated as a separate board, and are the judicial department of the theological institution. They are not supposed to be familiar with the details of the business of the principal corporation, nor to understand the practical effect of many things in its management. They do not represent the corporation as an administrative board, and at a hearing in regard to the management

of its affairs they would ordinarily need the aid of facts, suggestions, and arguments which the managers alone could properly present. Besides, while they act as judges, they are not in a position to defend ardently and vigorously acts of the corporation which might be unjustly and vigorously attacked by others.

It is a mistake to treat a proceeding before the visitors to remove five of the professors of an institution like the Theological Seminary at Andover as a suit against the professors alone. If they are wrongly there, the trustees should have removed them. The proceedings look to a change which would be likely to concern very deeply the interests of the seminary. Can it be said that the officers of the corporation who have been charged with its management in the past, and who will be held responsible for its condition in the future, are not interested in a matter so vitally affecting it? Shall the officers of the corporation in such a case be forced to keep silence, and trust to professors whose opinions or teachings are criticised to protect the interests of the corporation? Suppose a learned professor, with mistaken self-respect, should refuse to defend himself at all under accusations in regard to the character of his teachings, must the trustees run the risk of losing his valuable services for want of a proper presentation of the truth at the hearing before the visitors? Even if he is willing to do what he can in his own defence, shall the managing body of the corporation be refused an opportunity of presenting in their own way considerations which they deem vital to the welfare of their institution, which the professor might overlook, or present but feebly?

The statutes of the Theological Seminary at Andover are of a character to emphasize the considerations which are generally applicable in cases of this kind. Article 14 of the original statutes of the seminary is as follows: "Every professor in this institution shall be under the immediate inspection of the said trustees, and by them removed agreeably to the will of his founder for gross neglect of· duty, scandalous immorality, mental incapacity, or any other just and sufficient cause." Under the associate statutes this article is left in full force. *Murdock, appellant,* 7 Pick. 303. *Murdock* v. *Phillips Academy,* 12 Pick. 244. Except in the appointment of a standing committee to ascertain the qualifications of applicants for the advantages of the seminary,

and in the revision of the action of the trustees in the election of professors, the powers and duties of the board of visitors, as prescribed in Article 20 above quoted, are strictly visitatorial, and the provisions of the original act of incorporation of Phillips Academy and the additional act of 1807, and of the original constitution of the theological institution, primarily put upon the trustees the entire responsibility for the management of the seminary. The associate statutes are engrafted upon the original statutes and the acts of the Legislature, and are to be considered with them. The power and duty to remove a professor who teaches doctrines contrary to the statutes is in the trustees, and if they see fit not to remove one who is charged with teaching erroneously, the visitors may take original proceedings for that purpose. But we are of opinion that in such a case the statutes require that the trustees should be heard, if they desire, as they would be on an appeal from their own order of removal or refusal to remove in proceedings before themselves. In the present case the trustees were not heard before the visitors, although they made a formal application for leave to become a party at the trial. The action of the visitors in this particular is subject to revision by the Justices of this Court, who are expressly given authority, under Article 25 of the associate statutes, to set aside any decree which they deem contrary to the statutes, or beyond the just limits of the power of the visitors. By Article 20 the visitors are required to administer justice impartially, and exercise the functions of their office "according to the said statutes, the constitution of this seminary, and the laws of the land." We do not intimate that visitors, in determining questions before them, are to be held to all the rules and formalities which would be observed by a court of law under similar circumstances, nor that their action can ordinarily be revised by a court in the absence of an express provision to that effect in the statutes, unless it so affects a charity that a court of equity ought to interfere under its jurisdiction for the protection of trusts. But where a principle essential to a fair and proper adjudication of the rights of parties is disregarded in deciding a question, their action under statutes like those before us is invalid.

On questions so difficult that the members of the board of visitors were divided in opinion at the close of the hearing, we

cannot say in the present case that a different result might not have been reached if the trustees had been heard. In this view of the subject, it becomes unnecessary to consider many of the questions which were argued before us. The mistake of the visitors seems to have been in failing to appreciate that their functions in this hearing were merely visitatorial, and that they could not, as an administrative body, represent the interests and present the cause of the corporation whose conduct was on trial before them.

For these reasons we are of opinion that the action of the visitors was not in accordance with the statutes which they were trying to maintain, and that their decree must be set aside.

From the views already expressed, it follows that the record of the board of visitors should be amended, as requested by the appellant in the eighth particular of his suggestions for the diminution of the record, so as to show the proceedings in reference to the application of the board of trustees to appear and be heard before the visitors.

The application of the Trustees of Phillips Academy to be heard before us as a party in the original suit having been granted, their bill in equity is dismissed without prejudice.

*Decrees accordingly.*

FIELD, C. J. I dissent from that part of the opinion of the court which holds that the decree of the visitors should be set aside on the ground that the trustees as a corporation were not formally made a party to the proceedings before the visitors. It is immaterial whether or not the application of the trustees to be permitted to appear as a party, and the refusal of the visitors, are a part of the record of the visitors, because the record, even if this application and this refusal be excluded from it, does not show that the trustees as a corporation were cited to appear, or did appear, in the proceedings. It is abundantly evident that Professor Smyth, as well as the complainants, was represented before the visitors by learned counsel, and that both the prosecution and the defence were conducted with great thoroughness and ability, so that justice does not require that the decree be set aside on the ground that the trustees were not made a party, unless, as strict matter of law, it was indispensably necessary

to make them a party in order that the visitors might acquire jurisdiction to hear and determine the matter of the complaint. Professor Smyth in the complaint was charged with heterodoxy, if he was charged with anything that could justify the decree. It is conceded by the majority of the court that the visitors had original jurisdiction to hear and determine the complaint. The visitors have been made a corporation by the St. of 1823, c. 50, passed on January 17, 1824, and by that act are empowered, in § 1, to "do and perform all acts and things required of them by" the statutes of the founders, and this court by the same act is authorized, in § 3, "to declare null and void any decree or sentence of the visitors" which may be considered "contrary to the statutes of the founders, and beyond the just limits of the power prescribed to them thereby." Both the visitors and this court are acting under this special statute of 1823, c. 50. The question is whether there is anything in the associate statutes of the founders of the theological institution, subject to which Professor Smyth holds his office, that in a proceeding of this kind absolutely requires the trustees to be made a party.

In considering this, it is necessary to inquire particularly into the powers and duties of the visitors under the associate statutes. The act of the State of Massachusetts Bay, passed October 4, 1780, incorporating the Trustees of Phillips Academy in Andover, made its trustees the sole visitors, and prescribed that the number of the trustees should be not more than thirteen nor less than seven, that the principal instructor for the time being should be one of them, that a major part should be laymen and respectable freeholders, and also that a major part should consist of men not inhabitants of the town where the seminary was situated. St. 1780, c. 15, 5 Prov. Laws, (State ed.) 1418. No religious or theological test of any kind was prescribed as a qualification for the office of trustee.

By the original statutes of Phœbe Phillips and others who were the founders of the Theological Institution in Phillips Academy, and by the associate statutes of Moses Brown, William Bartlett, and John Norris, and by the additional statutes of the original founders, an entirely new visitatorial scheme was established for the theological institution. The associate statutes, subject to which Professor Smyth holds his office of Brown

Professor of Ecclesiastical History, prescribed a creed of theological doctrine to be taught in the institution, and required every professor on the associate foundation, "after a careful examination by the visitors with reference to his religious principles," to "publicly make and subscribe a solemn declaration of his faith in divine revelation, and in the fundamental and distinguishing doctrines of the Gospel as expressed in the following creed," etc., and then follows a long and carefully prepared creed.

Article 3 is as follows: "The preceding creed and declaration shall be repeated by every professor on this foundation at the expiration of every successive period of five years; and no man shall be continued a professor on said foundation who shall not continue to approve himself a man of sound and orthodox principles in divinity agreeably to the aforesaid creed." According to Article 6, the professors are to be chosen by the trustees, and the "choice presented to the visitors for their approbation," and, "if this choice be negatived, another election shall in like manner be presented, and, *toties quoties*, till an election be made which shall be approved by the visitors." Article 12 is as follows: "That the trust aforesaid may be always executed agreeably to the true intent of this our foundation, and that we may effectually guard the same in all future time against all perversion or the smallest avoidance of our true design, as herein expressed, we, the aforesaid founders, do hereby constitute a board of visitors to be, as in our place and stead, the guardians, overseers, and protectors of this our foundation. . . . And it is farther expressly provided, that the perpetual board of visitors first herein named shall consist of two clergymen and one layman, all of whom shall be men of distinguished talents and piety." By Article 13 it was provided that no person should be eligible as a visitor under the age of forty years; and, with the exception of the original visitors, a visitor ceases to hold his office when he completes his seventieth year. By Article 14 the board was to meet every year at the aforesaid theological institution to execute the business of their appointment; and "also, upon emergencies, when called thereto, as hereinafter directed." By Article 19 it was provided that every visitor, before taking his seat at the board, should make and

subscribe a declaration as follows: "Approving the statutes of the aforesaid theological institution, and those of the associate founders, I solemnly declare, in the presence of God and of this board, that I will faithfully exert my abilities to carry into execution the statutes of the said founders, and to promote the great object of the institution." Every visitor was also required to subscribe "the same theological creed which every professor elect is required to subscribe, and a declaration of his faith in the same creed shall be repeated by him at every successive period of five years."

The powers and duties of the board of visitors thus constituted and organized were set forth in Article 20, which is as follows: "The power and duties of the board of visitors thus constituted and organized shall be as follows, namely: to visit the foundation once in every year, and at other times when regularly called thereto; to inquire into the state of this our fund, and the management of this foundation, with respect both to professors and students; to determine, interpret, and explain the statutes of this foundation in all cases brought before them in their judicial capacity; to redress grievances, both with respect to professors and students; to hear appeals from decisions of the board of trustees, and to remedy, upon complaint duly exhibited, in behalf of the said professors or students; to review and reverse any censure passed by said trustees upon any professor or student on this foundation; to declare void all rules and regulations made by the said trustees relative to this foundation which may be inconsistent with the original statutes thereof; to take care that the duties of every professor on this foundation be intelligibly and faithfully discharged, and to admonish or remove him either for misbehavior, heterodoxy, incapacity, or neglect of the duties of his office; to examine into the proficiency of the students, and to admonish, suspend, or deprive any student for negligence, contumacy, or any heinous crime committed against the laws of God or the statutes of this foundation; and, in general, to see that our true intentions, as expressed in these our statutes, be faithfully executed, always administering justice impartially, and exercising the functions of their office in the fear of God, according to the said statutes, the constitution of this seminary, and the laws of the land."

Article 22 is as follows: " The visitors shall appoint a standing committee to ascertain the qualifications of applicants for the advantages of this foundation. Those whom they approve may be recommended for admission as resident applicants on trial for two months; and if at the expiration of this term the faculty approve them, they may be placed on the list of resident students till the next annual meeting of the visitors. And if, upon examination by the board of visitors, they be then approved, they shall be registered as associate students; but if not approved by the visitors, after careful examination and the best information respecting them, they shall be dismissed from the foundation." Article 26 is as follows: " Every annual meeting of the board of visitors shall be introduced with prayer, after which these statutes shall be read by the president."

I do not propose to inquire how far Moses Brown and William Bartlett and John Norris in establishing these statutes adopted the original statutes of the institution established by Phœbe Phillips and others, or to discuss any differences that may be suggested between the original statutes of the institution as modified by the additional statutes of the original founders and the associate statutes. I assume, without considering it, that the Brown Professor of Ecclesiastical History, holding his office as I understand under the associate statutes, might be removed from his office by the trustees, acting under Article 14 of the original statutes of the theological institution, " for gross neglect of duty, scandalous immorality, mental incapacity, or any other just and sufficient cause," and that heterodoxy is a just and sufficient cause. Still it is evident that for the protection of the institution from heterodoxy Moses Brown and his associates relied mainly upon the board of visitors established by them. The board of visitors was to be composed ultimately of two clergymen and one layman of distinguished talents and piety, in the prime of life, who were to read or to listen to the reading of the statutes every year, and who, before taking their seat at the board, were required to declare their faith in the creed prescribed by these statutes, and to repeat this declaration of faith every five years. They were required to examine the persons proposed for professors, with reference to their religious principles, and to examine the applicants for admission as students, and to approve or reject both

professors and students. The trustees might be of any or no theological belief, and a majority of them must be laymen, and no qualifications were required which would enable them to decide intelligently theological questions. It is manifest that the associate founders were unwilling to trust the management of their foundation on its theological side to the trustees. Accordingly, the associate statutes gave the visitors established by them not only general visitatorial powers, but special powers, both original and appellate, and it is in the exercise of one of these special powers that the visitors acted in the present case. No question arises in the case of the incidents of general visitatorial powers. So far as the visitors may attempt to supervise the action of the trustees, justice may require that the trustees should have notice and an opportunity to be heard. So far as the visitors are authorized " to hear appeals from decisions of the board of trustees," that board would be in a sense a party, as their record must be produced before the visitors, and as the trustees might be the prosecutors as well as judges, the trustees might have an interest in maintaining the propriety of their action.

But the duty imposed on the visitors " to take care that the duties of every professor on this foundation be intelligibly and faithfully discharged, and to admonish or remove him, either for misbehavior, heterodoxy, incapacity, or neglect of the duties of his office," as well as the duty " to examine into the proficiency of the students, and to admonish, suspend, or deprive any student for negligence, contumacy, or any heinous crime committed against the laws of God or the statutes of this foundation," is a duty directed, not against the trustees, but against the professors and students, and is one that must be performed by the visitors according to their own judgment, and not according to the judgment of the trustees. It is an original, and not a supervisory power. The complaint of Mr. Wellman and others against Professor Smyth, filed with the visitors, charged no maladministration on the part of the trustees ; and the conduct of the trustees was not in any way involved in the proceedings. It was the primary duty of the visitors to entertain the complaint, if it seemed to them to require consideration. The visitors, in determining the matter of the complaint, could render no decree

or judgment against the trustees. If the trustees, as a corpora-tion, had been cited to appear, it is difficult to see in what capacity they would appear in the proceedings, whether for the prosecution or the defence, or sometimes for one and sometimes for the other. If Professor Smyth had pleaded that he was guilty of the charges and specifications, could the trustees have pleaded that he was not guilty, or if he had pleaded that he was not guilty, could the trustees have pleaded that he was guilty? If the trustees are made a party, what is or can be the issue tried between them and the complainants, or between them and Professor Smyth? Suppose Professor Smyth had admitted in evidence before the visitors that the doctrines he taught were inconsistent with the creed established by the associate founders in manner and form as charged, and had consented to be removed from his office, or had asked leave to resign his office, could the trustees have prevented it?

There may be some embarrassment on the part of the trustees after Professor Smyth has been removed from his office by the visitors pending an appeal to this court. If the court affirms the decree, then he is removed from office, as of the date of the original decree; if the complaint is dismissed, or the decree is set aside, then he remains a professor until he dies, resigns, or is removed from office by a new decree. But the status of Profes-sor Smyth pending an appeal to this court, if he is removed by the visitors, is a consequence of the action of the visitors, and the embarrassment of the trustees arises not during the trial, but only after the visitors have determined the matter of the com-plaint. The relation of the trustees to Professor Smyth after the decree of the visitors pending an appeal to this court is the same, whether they have been admitted as a party to the original proceedings or not. The same embarrassment arises in every case where one body has the power of removing an officer and another body pays him his salary while he holds his office. It arises in most ecclesiastical trials. It arises in the case of the policemen of Boston appointed by the board of police, who may be removed by the board, but while they continue in office are paid by the city. It was never supposed that the city of Boston was a necessary party to a complaint against a policeman before the board of police. *Ham* v. *Boston Board of Police,* 142 Mass.

90.   In the present case the visitors are a special tribunal under the statutes of the associate founders and the statute of the Commonwealth for the trial of Professor Smyth on such a complaint as was made in this case.   Professor Smyth had the rights of any incumbent of an office who can only be removed for cause, and these are defined in *Murdock* v. *Phillips Academy*, 12 Pick. 244, 262.   The trustees were not the prosecutors.   The members of the board of trustees, if they knew anything of the matters charged, could be called as witnesses, but the conduct of the trustees as a corporation was not involved in the proceedings, and the opinion of this corporation on the truth or falseness of the charges, or whether, if true, they constituted heterodoxy, could not lawfully be used to influence the judgment of the visitors.   Even if the opinion of the trustees, which would regularly be shown by a vote, could be received for this purpose, it would be competent as evidence, but the competency of such evidence would not require that the trustees be made a party. If this were an appeal from the decision of the trustees, the opinion of that board could not lawfully be used to affect the judgment of the visitors.   This is the general rule in proceedings on appeal.   " They [the visitors] are bound, on appeal, to hear the cause *de novo* and without any regard to antecedent steps, except that the cause shall be regularly brought before them."   *Murdock, appellant,* 7 Pick. 303, 328, 329.   *A fortiori,* when the visitors take original jurisdiction of a complaint, the opinion of the trustees who never heard the complaint cannot be admissible.

I think that the appeal cannot be disposed of on the ground that the trustees were not made a party to the proceedings before the visitors, and that it should be considered on its merits, so far as under the St. of 1823, c. 50, this court is authorized to consider it.   I refrain from expressing any opinion on the merits, because there may be a new trial of the complaint by the visitors, and another appeal to this court.