TRUSTEES OF ANDOVER THEOLOGICAL SEMINARY *vs.*
VISITORS OF THE THEOLOGICAL INSTITUTION
IN PHILLIPS ACADEMY IN ANDOVER.

SAME *vs.* SAME.

VISITORS OF THE THEOLOGICAL INSTITUTION IN PHILLIPS
ACADEMY IN ANDOVER *vs.* TRUSTEES OF ANDOVER
THEOLOGICAL SEMINARY & others.

Middlesex.    January 26, 1925. — September 18, 1925.

Present: RUGG, C.J., BRALEY, CROSBY, CARROLL, & WAIT, JJ.

*Andover Theological Seminary. Visitors. Charity. Corporation,* Of vis-
itors, Meetings, Officers and agents. *Appeal,* By Trustees of Andover
Theological Seminary under St. 1823, c. 50, §.3. *Equity Jurisdiction,*
Suits by Visitors and by Trustees of Andover Theological Seminary.

The manifest purpose of the founders, original and associate, of the
Theological Institution in Phillips Academy in Andover, afterwards
known as Andover Theological Seminary, was that the trustees of the
institution should not be entrusted with the management of their
foundation in its theological aspects.

It was not inconsistent for the Trustees of Phillips Academy, founded for
the general education of youth and incorporated by Prov. St. 1780,
c. 15, 5 Prov. Laws, 1418, which gave to them alone visitatorial powers
as to the corporation, to accept gifts to be administered by them for a
theological institution, visitatorial powers as to which should not be
vested in them but should be vested in a body constituted by the
founders of the theological institution; and the amendment to the
charter of the Academy, St. 1807, c. 22, gave special authority to that
general effect.

At common law, the founder of a charitable institution has a right to
delegate to a person or a body of persons visitatorial powers with re-
lation to his foundation, and the visitor or visitors thus receive power
and authority to superintend the doings of the managers of the insti-
tution, to correct mistakes, to restrain abuses of authority, and to see
that the founder's will and purpose in creating the charity shall be
observed and carried into effect.

The founders of the Theological Institution in Phillips Academy in An-
dover, afterwards known as Andover Theological Seminary, created
their visitors with all the general powers and duties inherent in such a
body under the common law.

The wide sweep of powers given to the visitors by the founders of the
Theological Institution in Phillips Academy in Andover, by the general

words used and by the express statement of their purpose in providing visitors, namely, that their trust may always be executed agreeably to their true intent and be effectually guarded "in all future time against all perversion, or the smallest avoidance of" their true design, made inapplicable the principle that general words at the conclusion of specifications are to be restrained to incidental matters *ejusdem generis;* and therefore such wide powers so given were not cut down by enumerations in the instruments constituting the foundation.

The Visitors of the Theological Institution in Phillips Academy in Andover, incorporated by St. 1823, c. 50, have jurisdiction touching the seminary as an entity and not alone touching definite funds with which it has been endowed with special invocation of visitatorial powers; but they have no jurisdiction with regard to funds given with express provision that they are to be free from the powers of the visitors.

While all questions pertaining to the administration of Andover Theological Seminary are to be determined in the first instance by the corporation, Trustees of Andover Theological Seminary, incorporated by St. 1907, c. 260, the Visitors of the Theological Institution in Phillips Academy in Andover, incorporated by St. 1823, c. 50, have supervision and control of any decision by the trustees touching the affiliation or the closer affiliation of the seminary with any other institution.

The existence of the visitatorial powers above described in the corporation, Visitors of the Theological Institution in Phillips Academy in Andover, is not incompatible with the provisions of the charter of the Trustees of Phillips Academy; and the receipt by the Trustees of Phillips Academy after the amendment of its charter by St. 1807, c. 22, of gifts for the foundation of the Theological Institution in Phillips Academy subject to the conditions imposed by the founders of that institution did not constitute an impairment of any contractual obligation growing out of the original act of incorporation: no violation of art. 1, § 10, of the Constitution of the United States was involved.

*Smyth* v. *Phillips Academy,* 154 Mass. 551, reaffirmed.

By the authority of the "Associate Statutes" instituted by the founders of the Theological Institution in Phillips Academy, the Visitors of the Theological Institution in Phillips Academy in Andover are not restricted to a single annual visitation, but, being possessed of the general common law power of visitors and in addition the special visitatorial powers conferred by the associate and additional statutes, they may act on their own initiative as to a matter within their general jurisdiction; and thus may decide whether and when an emergency exists which demands a visitation.

In the circumstances, action by the Visitors of the Theological Institution in Phillips Academy in Andover at a meeting on June 15, 1922, declaring invalid an agreement and plan for closer affiliation of Andover Theological Seminary with Harvard Divinity School, was not rendered invalid by reason of the facts, that the meeting purported to be an adjournment of an annual visitation convened in November, 1921, which had been adjourned from time to time subject to the call either of the president or of the secretary, the rules of the corporation qualifying those officers with power to call meetings and no member of the corporation objecting

to the validity of the meeting; and, for similar reasons, the Trustees of Andover Theological Seminary had no valid objection to the meeting on June 15, 1922, on the ground that notice of the meeting given to them was not authorized by the visitors, or was not sufficient in form, or did not give adequate time for preparation for the hearing or was not seasonably served.

The mere facts, that it was provided in the instruments constituting the Visitors of the Theological Institution in Phillips Academy in Andover that no member of the board of visitors shall hold his office after reaching the age of seventy; that the meeting of June 15, 1922, in form, was an adjournment of an annual meeting convened on November 30, 1921; that one member of the board reached the age of seventy on December 29, 1921, but continued to act as a member of the board until after an adjourned meeting held on May 31, 1922, when, that fact coming to the attention of the other two members, his successor was elected on June 5, 1922, and qualified on June 8, 1922, did not invalidate the action of the board of visitors on June 15, 1922, the Visitors of the Theological Institution in Phillips Academy in Andover being a corporation and changes in its membership or officers not affecting its corporate entity or continuity.

The mere fact, that, upon receiving from the Trustees of Andover Theological Seminary a copy of the plan of closer affiliation with Harvard University at a meeting held on May 31, 1922, the visitors voted to authorize counsel to take steps necessary "to protect the interests of Andover Theological Seminary" to the end that the "proposed closer affiliation between Andover Theological Seminary and Harvard University may be fully presented to the Supreme Judicial Court," no corruption on the part of the visitors being charged, did not as a matter of law require a conclusion that the visitors had prejudged the matter to the extent that at the meeting of June 15, 1922, they did not hear the contentions of the trustees in a judicial spirit with a purpose single to perform their duty under the trust reposed in them and without bias due to their previous action.

The Visitors of the Theological Institution in Phillips Academy in Andover had jurisdiction to consider and decide the validity of the plan of closer affiliation between Andover Seminary and Harvard University, adopted by the Trustees of Andover Theological Seminary in 1922; and a plan for affiliation which had been put forward in 1908 was so different in character from that proposed in 1922 that a tentative approval of the 1908 plan by the visitors did not as a matter of law prevent them from examining the plan of 1922 and disapproving it.

The jurisdiction of the Visitors of the Theological Institution in Phillips Academy in Andover over the subject of the plan of closer affiliation between Andover Theological Seminary and Harvard University was not affected by the fact that the President and Fellows of Harvard College were not summoned before them for hearing on the validity of the plan for closer affiliation.

The ordinary exercise of visitatorial powers, if founded upon any evidence, is not reviewed by courts, the sole duty of the courts touching a determination by visitors acting within their general jurisdiction being to

interpose to prevent action contrary to law in the administration of the trust.

In determining the question, whether the Visitors of the Theological Institution in Phillips Academy in Andover erred as a matter of law in deciding that the 1922 "plan for closer affiliation between Andover Theological Seminary and Harvard University is inconsistent with the Associate Foundation Statutes" and that by its adoption "Andover Theological Seminary will be improperly managed and will not then be conducted in accordance with the principles of its foundation," this court is bound by the declared purpose of the founders of the charity, and it is not within the court's province to give consideration to the degree of public advantage likely to flow from the trust as founded, compared with some other more or less analogous purpose, or to the present prevalence of the religious creeds or doctrines to be taught or to the court's own beliefs concerning them: the nature of the institution as declared by the founders is the single end to be sought.

After a detailed examination of findings by a master relating to the purposes of the founders of Andover Theological Seminary and the 1922 plan for closer affiliation of the seminary with Harvard University, it was *held*, that such a plan was not compatible with the foundation of the Andover Theological Seminary or with its maintenance as a separate, distinct and independent theological school; and a decision by the visitors to that effect was *held* not to be contrary to law, and an appeal therefrom by the Trustees of Andover Theological Seminary under St. 1823, c. 50, § 3, was dismissed.

The mere fact, if it be a fact, that it has become impracticable to execute the charitable trusts expressly established with respect to the Andover Theological Seminary, does not authorize the trustees to make a different disposition of the charity: the doctrine of *cy pres* can be administered only by a court of equity and not by the managers of a charity.

In determining the questions above described, no consideration should be given to the wisdom or lack of wisdom of the founders of the charity in the establishment of the conditions which they imposed.

In the circumstances, even giving collective force to acts of alleged relaxation by the visitors from strict adherence to the requirements of the Associate and Additional Statutes constituting the foundation of the seminary, they were not enough to bar the visitors from asserting the position which they here take; *whether* circumstances might arise which would work something in the nature of an estoppel against the visitors was not considered.

This court has jurisdiction under St. 1823, c. 50, § 3, of an appeal by the Trustees of Andover Theological Seminary from a determination by the Visitors of the Theological Institution in Phillips Academy in Andover that the 1922 plan of closer affiliation of Andover Theological Seminary and Harvard University is incompatible with the conditions and principles imposed by the gift founding the seminary, and that by the adoption of that plan the seminary would be improperly managed and not be conducted in accordance with those principles.   For the reasons above stated, the appeal was dismissed, and the decision of the visitors was allowed to stand.

This court has jurisdiction of a suit in equity by the Trustees of Andover Theological Seminary to have the decisions by the Visitors of the Theological Institution in Phillips Academy in Andover above described set aside and to have the visitors restrained from further interfering with the execution of the plan. For the reasons above stated, the suit was dismissed.

This court has jurisdiction of a suit in equity brought by the corporate visitors in its own name and without the intervention of the Attorney General to have the decisions above described declared valid and the Trustees of Andover Theological Seminary and the President and Fellows of Harvard University enjoined from carrying the plan for closer affiliation into execution. For the reasons above stated, a decree for the plaintiff was ordered.

The question, whether a decision in 1908 by the Visitors of the Theological Institution in Phillips Academy in Andover, wherein they determined that in removing the seminary from Andover to Cambridge "the Trustees did not act contrary to the intention of the founders of the seminary," but claimed and reserved "a right to examine and pass upon the practical working of the scheme of affiliation with Harvard University when it shall fully develop," may be treated as an unrevoked approval of that plan of affiliation, was *held* not to be before the court and not to require a decision.

APPEAL, dated July 31, 1922, and filed in the Supreme Judicial Court for the Commonwealth on January 23, 1923, by the Trustees of Andover Theological Seminary (hereinafter called the trustees) under St. 1823, c. 50, § 3, from action by the Visitors of the Theological Institution in Phillips Academy in Andover (hereinafter called the visitors) declaring void a plan of closer affiliation of the seminary with Harvard University, described in the opinion;

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Middlesex on July 31, 1922, by the trustees against the visitors, seeking to have the action of the visitors declared null and void, and further action by the visitors enjoined; and a

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Middlesex on August 17, 1922, and afterwards amended, by the visitors against the trustees, the corporation, the President and Fellows of Harvard College, and the Attorney General, seeking to have the agreement and proposed closer affiliation declared null and void and action thereunder enjoined.

The suits in equity were referred to the same master.

Material findings by the master in reports filed by him are described in the opinion.

The full record of the visitors having been certified under the appeal and the two suits in equity having been reserved by *Pierce*, J., upon the pleadings, the master's reports and exceptions thereto by the visitors and the trustees, for determination by the full court, the three cases were heard together in this court.

*H. S. Davis*, for Trustees of Andover Theological Seminary.

*T. Weston*, (*H. B. Patrick* with him,) for Visitors of the Theological Institution in Phillips Academy in Andover.

*R. Gray & A. A. Schaefer*, for the President and Fellows of Harvard College, submitted the case without argument or brief.

*M. F. Weston*, Assistant Attorney General, submitted the case without argument or brief.

RUGG, C.J.    These proceedings grow out of a plan for closer affiliation between Andover Theological Seminary and Harvard Divinity School, adopted in 1922. Although differing in form and details, the three proceedings in the main are directed to the same end, namely, the ascertainment of the true legal force and effect of a determination by the visitors of the Andover Seminary that that plan for closer affiliation between the two institutions (1) is inconsistent with the "Associate Foundation Statutes" of the Andover Seminary and (2) thereby Andover Seminary will not be conducted in accordance with the principles of its foundation, concluding with the specific declaration that that plan is void. This determination is also termed a "decree." See *Holcombe* v. *Creamer*, 231 Mass. 99, 103, 104.

The cases are somewhat complicated. The arguments have taken a wide scope. The points involved are numerous. The discussion falls into five principal divisions:

First, the main design and purposes of Andover Theological Seminary and the restrictions of its founders.

Second, the powers of the visitors of the seminary.

Third, the validity of the determination of the visitors touching the plan of the closer affiliation of the seminary with Harvard Divinity School.

Fourth, questions of evidence.

Fifth, form of procedure and relief to be afforded.

First. It is necessary to examine the history of the Andover Theological Seminary, the declarations of its founders so far as they are constituent elements of the seminary, and the donations and trusts on which it was founded. The salient facts in this connection are set forth at length in the pleadings and in the master's reports. They may be stated summarily so far as essential for this judgment. The dominant religious denomination in this Commonwealth from Colonial times to the beginning of the nineteenth century was the congregational. The theological views of that denomination were known later as orthodox or trinitarian. By 1805 a wide doctrinal difference had developed within the churches of eastern New England and especially of Boston and vicinity between the orthodox or trinitarian congregationalists on the one side and the liberal or unitarian congregationalists on the other side, although the unitarian did not take on an organized denominational form until 1825. In 1805 Henry Ware, a liberal and later known as a unitarian, was elected professor of divinity in Harvard College. These doctrinal differences between orthodox or trinitarians and liberals or unitarians and the election of Henry Ware as professor of divinity in Harvard were the causes of the founding of the theological school in Phillips Academy commonly called the Andover Seminary. In 1806 Eliphalet Pearson, the professor of Hebrew in Harvard, resigned. With others he became interested in a project to prepare men for the ministry at Phillips Academy in Andover under orthodox and trinitarian instruction. These efforts accomplished their purpose. The charter of Phillips Academy in Andover, founded by a donation made in 1778 for the general education of youth and incorporated by Prov. St. 1780, c. 15, 5 Prov. Laws, 1418, under the name, Trustees of Phillips Academy, was amended by St. 1807, c. 22, expressly enabling the trustees to receive and hold donations for the purposes of a theological institution. Thereafter in the same year three persons joined in making gifts to the trustees for the use and endowment of a "Theological Insti-

tution in Phillips Academy." These gifts were upon the "express conditions . . . that the said Institution be accepted by the Trustees . . . and . . . be forever conducted and governed by them, and their successors, in conformity to the following general Principles and Regulations," reserving the right to themselves during their lives to make additional regulations. Then follow thirty-four "Articles" which contain amongst other matters minute directions as to the subjects to be taught and the religious beliefs to be entertained by teachers and to some extent by the students in the theological institution. This instrument of gift is called the "Constitution of the Theological Institution in Phillips Academy." It was accepted by the Trustees of Phillips Academy. In this "Constitution" repeated emphasis is laid in various forms of words upon doctrines and names expressive of the fixed purpose that the theological seminary to be established was to be devoted exclusively to teaching in support of "orthodox," "evangelical" "trinitarian" tenets, and in opposition to all denominations regarded as of a contrary nature. Further provisions of the "Constitution" are that every professor in the seminary shall be "of the Protestant reformed religion, in communion with some Christian Church of the Congregational or Presbyterian denomination . . . a man of sound and orthodox principles in Divinity, according to that form of sound words or system of evangelical doctrines, drawn from the Scriptures, and denominated the Westminster Assembly's Shorter Catechism." Every professor is also required on the day of his inauguration and in the presence of the trustees publicly to "make and subscribe a solemn Declaration of his faith . . . in the fundamental and distinguishing doctrines of the Gospel of Christ, as summarily expressed in the Westminster Assembly's Shorter Catechism; and he shall furthermore solemnly promise . . . that he will maintain and inculcate the Christian faith, as above expressed . . . and in opposition not only to Atheists and Infidels, but to Jews, Mahommetans, Arians, Pelagians, Antinomians, Arminians, Socinians, Unitarians, and Universalists, and to all other heresies and errors, ancient or modern . . ." It is also required that this

"Declaration" shall be repeated in the presence of the trustees by each professor at the expiration of every successive period of five years, and that no man shall be continued as a professor unless he is constantly steadfast in "*sound* and *orthodox* principles in *Divinity*, agreeably to the system of evangelical doctrines" of the said catechism. Any failure in these particulars requires his instant removal from the professorship. The trustees were given power to make additional regulations "not inconsistent with the Regulations established in this *Constitution* . . . nor with the object of this Institution."

At about that time two groups developed among orthodox trinitarian congregationalists, one known as "Old Calvinists" or "Moderate Calvinists" and the other as "New Calvinists" or "Consistent Calvinists" or "Hopkinsians." The persons primarily interested in founding the Theological Institution in Phillips Academy belonged to the former group. Persons belonging to the latter group were planning to found a school for the preparation of men for the ministry to be located at Newbury. As a result of negotiations, these two bands of congregationalists joined in favor of the "Theological Institution in Phillips Academy." The difficulty in effecting this combination lay in framing a creed, which, in spite of their doctrinal differences, should be acceptable to both groups. The "Associate Creed," contained in the "Associate Statutes" (hereafter described) was adopted as a compromise. It was a statement upon which both groups of calvinists or orthodox trinitarian congregationalists could agree. It omits much which is in the Westminster catechisms. It is framed in technical language, some of it from the Westminster Assembly's Shorter Catechism and some from other sources. It is unique as a creed. No other theological seminary and no church has precisely this creedal basis.

In carrying out the plan of compromise between these two groups of calvinists of somewhat divergent doctrinal views, two instruments were presented to the Trustees of Phillips Academy. One under date of March 21, 1808, was a deed of gift transferring a considerable sum of money to the trustees

from three persons belonging to the "New Calvinists" or "Hopkinsians." This instrument is termed the "Associate Foundation" and includes the "Associate Statutes." This gift was for the endowment of two professorships and "toward the maintenance of such Students in Divinity, as may be proper candidates for gratuitous support," the trust to be administered "agreeably to the following Statutes." Then follow twenty-seven articles which are called "Associate Statutes." One of these was the Andover creed, being the statement of faith upon which both groups of trinitarian congregationalists had agreed. Another article in the following words provided a board of visitors for the theological seminary to be established: "That the Trust aforesaid may be always executed agreeably to the true intent of this our Foundation; and that we may effectually guard the same in all future time against all perversion, or the smallest avoidance of our true design, as herein expressed; We, the aforesaid Founders, do hereby constitute a Board of Visitors, to be as in our place and stead the *Guardians, Overseers,* and *Protectors* of this our Foundation." This instrument also displays a settled and deliberate purpose to confine the donation to the maintenance of an institution for the propagation of calvinistic orthodox trinitarianism by education in its tenets of those destined for the ministry. The board of visitors was to be a self-perpetuating body. Its duties are set out at considerable length in these articles. It was to consist, as ultimately constituted, of three persons, two clergymen and one layman, "all of whom shall be men of distinguished talents and piety." Every person, before becoming a visitor, is required to make and subscribe a declaration in these words: "Approving the Statutes of the aforesaid Theological Institution, and those of the Associate Founders, I solemnly declare, in the presence of God and of this Board, that I will faithfully exert my abilities, to carry into execution the Statutes of the said Founders, and to promote the great object of the Institution." He must also subscribe the same Andover creed, which every professor is required to subscribe, and repeat a declaration of faith in the same creed at every successive period of five

years.   All the statutes must be read by the president at every annual meeting of the visitors.   The visitors are required also to examine those proposed for professors and all applicants for "the advantages of this Foundation."   As revealing the significance attached to the Andover creed, in article XXVII of the associate statutes are found these words: "It is strictly and solemnly enjoined, and left in sacred charge, that every article of the above said Creed shall forever remain entirely and identically the same, without the least alteration, or any addition, or diminution."

Under date of May 3, 1808, the original founders of the theological institution, who had as a part of their gift established its "Constitution," acting pursuant to the power and right therein reserved to them, made and ordained thirteen articles termed "Additional Statutes" in addition to and as a part of their previous "Constitution," upon a condition which has been fulfilled.   These "Additional Statutes" embody the salient parts of the "Associate Statutes," including the "Andover Creed" with a slight addition, and the provisions for a board of visitors, mostly in their exact words. In meaning and legal effect they are identical, so far as concerns the cases at bar.

It is manifest that the associate founders and the original founders by adopting their statutes were unwilling to trust the trustees with the management of their foundation in its theological aspects.   No theological belief was required of the trustees and a majority of them must be laymen.   According to the obvious import of these statutes, the visitors were designed to supply this additional feature of management for the donations made at the foundation of the theological institution, and especially to see to it that there was no deviation in the management of that institution from the declared purposes of the founders.

The donations embodied in the "Associate Foundation" with the "Associate Statutes" were accepted by the trustees. According to the provisions of the associate statutes, the plan was to be experimental for seven years and thereafter upon vote of visitors and trustees that a "perpetual coalition is

important and desirable; Union shall be established upon Visitorial principles, to continue, as the Sun and Moon forever." Such union was seasonably voted.

The Theological Seminary in Phillips Academy accordingly was established in Andover. It was opened shortly after the donation of the associate founders was received. The documents upon which it rested were the three instruments already described, namely, the constitution of the Theological Institution in Phillips Academy, the associate statutes and the additional statutes. Its support at the outset was wholly dependent upon the gifts made under those instruments. Various gifts now aggregating with the donations of original and associate founders about $1,000,000 have been made during the intervening years to the Trustees of Phillips Academy for the use or benefit of the theological seminary or purposes connected with it, many of them by instruments containing no reference to the visitors. There were named in the associate statutes and the additional statutes the persons who were to act as visitors at the outset. Included among them were the three associate founders. No successors were to be chosen except for three, to which number the board was ultimately to be reduced and at which it was to be maintained.

The members of the board of visitors were incorporated by St. 1823, c. 50, under the name "Visitors of the Theological Institution in Phillips Academy in Andover." It will hereafter be called visitors. That corporation was created, according to the words of its charter, "to be the guardians, overseers and protectors of such donations as have been, or hereafter may be made subject to their inspection, with the assent of the trustees of said academy, according to the terms and conditions prescribed by the statutes of the founders thereof, agreeably to the intentions of the founders."

The seminary was conducted under the name Theological Institution in Phillips Academy in Andover as one of its departments by the corporation Trustees of Phillips Academy from 1808 until the enactment of St. 1907, c. 260. By the latter statute the "Trustees of Andover Theological Seminary" was incorporated. The new corporation became

the successor of the old corporation with respect to all the real and personal property theretofore held in trust for the benefit of the theological institution, subject to the same trusts, limitations, conditions, provisions, rights, obligations and regulations, and was charged with and bound by all the duties and obligations theretofore resting on the old corporation toward and concerning the theological institution, to be governed by the same provisions and regulations as to organization, membership and conduct of business. The new corporation hereafter will be called trustees. Other legislative enactments were passed from time to time during the nineteenth century with respect to the theological seminary but no reference need be made to them.

The trustees voted in 1908 to remove the Andover Theological Seminary to Cambridge. Its real estate in Andover was sold. Land was bought in Cambridge adjoining land of Harvard University and a building was erected thereon for the uses of the seminary. In 1908 the trustees and the president and fellows of Harvard College adopted a plan of affiliation between the seminary and the Harvard Divinity School. The visitors, by vote of two to one of its corporate members, adopted a resolution determining "that, in removing the Seminary to Cambridge, the trustees did not act contrary to the intention of the founders" but claiming and reserving "a right to examine and pass upon the practical working of the scheme of affiliation with Harvard University when it shall fully develop." In accordance with this plan of affiliation the seminary was removed to Cambridge and there conducted until 1922.

Second. The powers of the visitors are next to be determined.

1. Those who made the first gifts for the establishment of the Theological Institution in Phillips Academy were its founders in the technical sense. *St. John's College* v. *Todington*, Burr. 158. *Sutton's Hospital*, 10 Co. Rep. 1, 33a. Although the trustees of Phillips Academy had been incorporated and had received donations for the establishment of the academy for general education more than twenty-five years before, yet there was no theological institution or

department until the donations of those who executed as expressive of the terms of their gifts the three instruments already described and called the constitution, the associate statutes and the additional statutes.  There was no incompatibility in making those gifts to an existing educational corporation and at the same time becoming, in the strictly legal meaning, founders of the new department, institution or school to be established within and as a corporate part of the preëstablished academy.  As founders of that institution they had the right at common law either to become the visitors themselves or to appoint other persons or a body to act as visitors with visitatorial powers.  The "Associate Statutes" show unmistakably that those who signed it had a lively appreciation of the visitatorial powers inherent in founders of charities and a correct conception of the appropriate words in which to clothe others with those powers. The institution which they were endowing was in its aim and curriculum entirely distinct and separate from the existing academy.  It was new in every particular except that its administration was entrusted to an existing educational corporation.  Where individuals are incorporated to manage a charity the visitatorial power is deemed to reside in them in their corporate character unless there is an express reservation of that power to the founders or to others to whom it is assigned.  *Sanderson* v. *White*, 18 Pick. 328, 338, 339. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 675.  The original act incorporating the Trustees of Phillips Academy constituted them the sole visitors of the corporation.  But that is not inconsistent with acceptance by them of funds for the foundation of a new institution to be administered by them with visitatorial powers in others.  Moreover the amendment to the charter, St. 1807, c. 22, was a special authorization to that general effect.

The nature and scope of the general visitatorial power where not amplified or restricted by the terms of the foundation were stated by Chief Justice Shaw in *Nelson* v. *Cushing*, 2 Cush. 519, 529, 530, in these words: "The founder of a charitable institution has a right . . . by the visitatorial power, which he may . . . delegate to other persons or

bodies, to see that his will and purpose in creating the charity shall be observed and carried .into effect, and to restrain mismanagement and correct abuses." ". . . a general visitatorial power . . . gives a general superintendence . . . the authority and power of a board of visitors" is that of "a domestic tribunal, constituted by the founder of a charity, under the authority of law, to superintend the doings of the trustees, to correct mistakes, and to restrain all abuses of authority." The visitatorial function rests on the principle of law respecting eleemosynary institutions that since the individual managers "are liable, as well as private persons, to deviate from the end of their institution. . . . there shall somewhere exist a power to visit, inquire into, and correct all irregularities and abuses in such corporations, and to compel the original purposes of the charity to be faithfully fulfilled." Mr. Justice Story in *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 673.

2. The founders of the theological seminary created their visitors with all the general powers and duties inherent in such a body under the common law. That is apparent not only from general words used but from the express statement of their purpose in providing visitors, namely, that their trust may always be executed agreeably to their true intent and be effectually guarded "in all future time against all perversion, or the smallest avoidance of" their true design. These words dominate and vivify the whole instrument. The founders enumerate in other articles additional obligations and authority. They did not thereby cut down the general visitatorial powers. These are plainly conferred. Lest anything might have been overlooked, at the end of the enumeration of powers and duties general words are added. The wide sweep of powers given to the visitors and the words and the context of that grant make inapplicable the principle that general words at the conclusion of specifications are to be restrained to incidental matters *ejusdem generis.* That principle is to be applied with some caution and only to effectuate the main purpose of the writing to be construed. *Attorney-General* v. *Brown,* (1920) 1 K. B. 773. Breadth and not narrowness of power was the manifest

design of the founders in describing the functions of the
visitors.  The most significant and comprehensive of these
"powers and duties" are set forth in article XX of the asso-
ciate statutes and article X of the additional statutes in these
words: " . . . to visit the Foundation once in every year, and
at other times, when regularly called thereto; to inquire into
the state of this our Fund, and the management of this
Foundation, with respect both to Professors and Students;
to determine, interpret, and explain the Statutes of this
Foundation in all cases, brought before them in their judicial
capacity; to redress grievances, both with respect to Pro-
fessors and Students; to hear appeals from decisions of the
Board of Trustees, and to remedy upon complaint, duly ex-
hibited in behalf of the said Professors or Students; to review
and reverse any censure passed by the said Trustees upon
any Professor or Student on this Foundation; to declare
void all Rules and Regulations, made by the said Trustees,
relative to this Foundation, which may be inconsistent with
the original Statutes thereof; to take care that the duties of
every Professor on this Foundation be intelligently and
faithfully discharged, and to admonish or remove him, either
for misbehavior, heterodoxy, incapacity, or neglect of the
duties of his office; to examine into the proficiency of the
Students, and to admonish, suspend, or deprive any Stu-
dent for negligence, contumacy, or any heinous crime, com-
mitted against the laws of God or the Statutes of this Foun-
dation; and in general, to see that our true intentions, as
expressed in these our Statutes, be faithfully executed;
always administering justice impartially, and exercising
the functions of their office in the fear of God, according to
the said Statutes, the Constitution of this Seminary, and
the Laws of the Land."

3. The theological institution was established on certain
foundations.  The original founders of the institution were
entitled to make such statement of visitatorial powers as
they chose.  The instrument transferring to the Trustees
of Phillips Academy the initial donations and making pro-
vision for the establishment of a "Theological Institution in
Phillips Academy" was significantly designated "Constitu-

tion of the Theological Seminary." Their "Additional Statutes" made pursuant to power reserved to them in the constitution, established also the board of visitors and described their powers. These additional statutes in conjunction with the associate statutes create, specify and bound the powers of the visitors. They thereby were clothed with both general and special visitatorial authority and duties. These were accepted by the Trustees of Phillips Academy and were confirmed by St. 1823, c. 50, whereby the visitors were made a corporation. They thus were incorporated into the "Constitution" of the theological institution. The visitors when created were visitors of the theological institution and not of particular donations.

It is specified that the visitors are to visit the "Foundation." In that context the word manifestly means the institution itself with all that appertains thereto. The constitution of the original founders (to which their additional statutes were supplementary and not substitutional) definitely refers in article XXXIV to future gifts to the same ends. The name under which the visitors were incorporated was "The Visitors of the Theological Institution in Phillips Academy." The clear implication of this name is that they are visitors of the whole theological institution and not of particular funds held for its benefit. The purport of the associate and additional statutes is that the visitors are established with respect to the theological institution. Their powers are not narrowed to particular funds. The board of visitors became an integral part of that institution. The jurisdiction of the visitors extends not alone to the donations made by the original and associate founders, but to all subsequent general and unrestricted gifts for the benefit of the theological institution.

The visitatorial feature to be exercised by a separate board outside the trustees was a constituent element of the theological institution. All gifts to an institution thus established are by implication, unless express provision is made to the contrary, made subject to the visitatorial power. This is the general principle. If a subsequent donor makes a new gift to the old foundation, that is to say, to the institution established by the original foundation without erecting

either a special trust or a distinct visitor, then the visitor of the old foundation will be visitor of the new gift. It is considered that the donor intended that his gift should fall under the general statutes and rules of the institution and be regulated with the rest of its property. Such subsequent donors are not founders of the charity. They find it in existence. They merely aid, assist and increase it. They take it as they find it with all its powers and limitations, including the visitatorial. *Green* v. *Rutherforth* 1 Ves. Sr. 462, 472, 473. *Rex* v. *Bishop of Ely,* 1 Wm. Blackstone, 70, 87. *Ex parte Inge,* 2 Rus. & Myl. 590, 596, 597. *Attorney General* v. *Talbot,* 3 Atk. 662, 674, 675; *S. C.* 1 Ves. Sr. 77, 78. *Attorney-General* v. *Flood,* Hayes & Jones, App. xxi, xxxv. *St. John's College* v. *Todington,* Burr. 158, 202, 203, 204. *Matter of Endowed Schools Act,* L. R. 10 A. C. 304, 308. This general principle is recognized in *Cary Library* v. *Bliss,* 151 Mass. 364, 377, where it was held that subsequent donors presumably "knew on what trusts the library was established and was to be managed, and that they made their gifts to be held under the same trusts." This general principle is not cut down in the light of all the other circumstances by the words of § 1 of St. 1823, c. 50, to the effect that the visitors as a corporation are to be the guardians, overseers and protectors of "such donations as have been, or hereafter may be made subject to their inspection, with the assent of the trustees of said academy." The unqualified acceptance by the trustees of unrestricted gifts for the theological seminary imports the same visitatorial powers as obtain with respect to that department of the institution under the express words of the original and associate founders. Of course the visitors have no power with respect to gifts made to the trustees and accepted by them unqualifiedly with the express provision that they are not to be subject to the visitatorial functions. It follows that the visitors have jurisdiction touching the seminary as an entity and not alone touching definite funds with which it has been endowed with special invocation of visitatorial powers, but omitting those given with express provision that they are to be free from the powers of the visitors.

The meaning of the ample grants of power conferred upon the Andover visitors has been before this court in two cases. Much in small space has there been said pertinent to the issues here to be decided. In *Murdock, appellant,* 7 Pick. 303, at page 322 occur these words: "... to the visitor ... belongs the right and power of inspecting the affairs of the corporation and superintending all officers who have the management of them, according to such regulations and restrictions as are prescribed by the founder in the statutes which he ordains .... By these different provisions [of the statutes] the trustees are invested with authority, in the first instance, to supervise the concerns of the institutions .... A general appellate power is given to the body denominated *The board of visitors* who have also original authority concurrent with that of the trustees as to most of the subjects committed to their charge." In *Smyth* v. *Phillips Academy,* 154 Mass. 551, it was said at pages 554, 557, that the general duty of the board of visitors "is to visit the corporation [which is under the management and control of the trustees] and see that the trustees manage the institution in conformity with the statutes, and, if errors or abuses are discovered, to correct them .... Their visitation is for the purpose of inquiring into its condition, and ascertaining whether it is properly or improperly managed, and whether in all respects it is conducted according to the principles of its foundation."

A manifest result from these decisions and principles is that under the law the authority of the visitors under their general and special powers is very great. While all questions pertaining to the administration of the seminary are to be decided in the first instance by the trustees, the visitors have supervision and control of any decision of such magnitude as that here in issue.

4. It has been urged that the powers of visitors as created by the associate and additional statutes and as recognized and established by St. 1823, c. 50, are incompatible with the provisions of the charter of the Trustees of Phillips Academy. That charter, Prov. St. 1780, c. 15, 5 Prov. Laws, 1418, provided amongst other matters that the persons named as incorporators and their successors should be "the sole visitors,

trustees, and governors of the said Phillips Academy." The theological institution when founded constituted a new department of the established academy. It is not necessary to inquire or decide whether its corporate powers were broad enough to have enabled the original corporation to organize a department for theological education and to receive special gifts to that end. That course was not pursued. On the contrary the original charter on petition of the trustees was amended by St. 1807, c. 22, whereby the trustees were specifically empowered to receive and hold gifts yielding a limited income "for the purpose of a theological institution," the income whereof was to be "always applied to said objects, agreeably to the will of the donors, if consistent with the original design of the founders of the said academy." This statute conferred the express power upon the trustees to receive gifts subject to such conditions as the donors might impose. That authorization was comprehensive enough to enable the corporation to receive gifts for the theological institution subject to such powers of visitation as the donors might impose and the trustees accept. Gifts were made and accepted by the trustees on the strength of St. 1807, c. 22. All this constituted no impairment of any contractual obligation growing out of the original act of incorporation. The founders of the academy, the trustees as a corporation and intervening benefactors of the academy suffered no impairment of any right, when the Commonwealth conferred a new power upon the corporation to receive new gifts to be applied to a new purpose. The former gifts, the former powers, and the former obligations were not altered, enfeebled or affected. Those gifts could not be diverted to different uses; the obligations were not weakened or strengthened or modified, but remained in full force to be performed by the original corporation; that corporation was the same in incorporators, the same in rights of succession, and unchanged in every particular except that a new educational faculty had been superimposed on its former corporate rights. It was not disabled from exercising any prerogative, right, power or duty. Its powers were augmented, not impaired. The extension of corporate potentiality into a new field to operate therein only to

the extent permitted by special gifts directed solely to that end cannot impair any corporate or other right theretofore existing. All the gifts up to the incorporation of the trustees of the seminary by St. 1907, c. 260, were made to the corporation established by Prov. St. 1780, c. 15, 5 Prov. Laws, 1418. But all gifts involved in the present controversy were made for the theological institution recognized by St. 1807, c. 22, and not for the general uses of Phillips Academy. There is no sound ground for attack upon the constitutional power of the visitors with respect to the theological seminary. There is here no violation of art. 1, §10, of the Constitution of the United States. The principle established by that constitutional guaranty is recognized and applied in all its amplitude, but it does not cover the facts here presented. *Commonwealth* v. *Farmers & Mechanics Bank*, 21 Pick. 542, 556. *Opinion of the Justices*, 9 Cush. 604, 610. *Cary Library* v. *Bliss*, 151 Mass. 364. *Opinion of the Justices*, 237 Mass. 619, 622. *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

The precise questions now raised, including the constitutionality of St. 1823, c. 50, incorporating the visitors and its repugnance to Prov. St. 1780, c. 15, 5 Prov. Laws, 1418, whereby the Trustees of Phillips Academy were incorporated, and impairment of the grant of powers there made, was raised and settled in *Smyth* v. *Phillips Academy*, 154 Mass. 551. In concluding the discussion upholding the constitutionality of the act incorporating the visitors, it was said at page 556: "The validity of these statutes, [of the associate founders] and of the act incorporating the board of visitors, seems to have been settled by adjudications of this court. *Phillips Academy* v. *King*, 12 Mass. 546. *Murdock, appellant*, 7 Pick. 303. *Murdock* v. *Phillips Academy*, 12 Pick. 244." The ground has been reëxamined in the light of the argument now presented. We remain satisfied with the conclusion stated in the Smyth case.

Third. The next matter for consideration is the determination of the visitors touching the plan of closer affiliation of the Andover Theological Seminary with the Harvard Divinity School. This question must be considered with reference (1) to the forms of the procedure of the visitors and

their individual and personal competency to act; (2) to their jurisdiction over the subject of that plan; and (3) their determination actually made on the merits.

1. Several objections preliminary in nature are urged against the forms of procedure and competency of the visitors. These objections relate to essential steps prerequisite to any action by the visitors touching the consideration of the plan for closer affiliation.

(a) The meetings, at which that plan was considered, cannot be pronounced invalid. One visitation each year is required, but the activities of the visitors are not confined to a single meeting or a single occasion, or to times when called to the seminary by a summons from a source outside their own officers. It is provided by art. XIV of the associate statutes that the visitors shall meet "once in every year, at the aforesaid Theological Institution . . . also upon emergencies, when called thereto, as hereinafter directed; . . . " This latter sentence includes special meetings to be called by the president or secretary under the terms of art. XVI whenever required by any necessity or exigency. It is not confined to the visits to the foundation "at other times, [in addition to the regular annual visitation] when regularly called thereto," by some person, board or organization clothed with that authority as set forth in art. XX. The words "when called thereto" in art. XIV refer both to special meetings called as "directed" in art. XVI and to the "other times [of visits to the Foundation] when regularly called thereto," of art. XX where specific directions are found. Without determining the precise meaning of the words "regularly called thereto," it is sufficient to say that a special visitation may be had when a meeting of the visitors upon a necessary occasion is called to that end in accordance with art. XVI. The visitors under these provisions are not restricted to the single annual visitation. The visitors are themselves to decide whether an emergency exists which demands a visitation. The specific powers conferred upon the visitors are far more comprehensive than general visitatorial powers. Being possessed of the general common law power of visitors and in addition the special visitatorial

powers conferred by the associate and additional statutes, they may act on their own initiative as to a matter within their general jurisdiction. The right of visitors to act spontaneously appears to be recognized in *Attorney General v. St. Cross Hospital,* 17 Beav. 435, 466.

(b) The circumstances of the meeting of June 15, 1922, when the hearing was given to the trustees respecting the plan for closer affiliation, were these: Without narrating the details of meetings and adjournments, it is enough to say that the annual visitation was fixed for November 30, 1921. At that time no quorum was present by reason of a storm. The next record is that the adjourned annual meeting and visitation was held on December 30, 1921. According to the records of the visitors that meeting was kept alive by successive adjournments until June 15, 1922, when the hearing was given to the trustees. The several adjournments were made, one subject to the call of the president, and others subject to the call of the secretary. Whatever objections might obtain with respect to adjournments in this form of meetings of public, municipal or ordinary corporate bodies as being a delegation of power vested in the whole body, there was no invalidity in the adjournments here in question because under the rules governing the visitors the president or, under stated circumstances, the secretary was clothed with power to call meetings. Moreover, the meetings were held apparently without objection by the visitors and by consent of all of the members of the corporation. Letters were written in March, 1922, by the clerk of the trustees to two of the members of the board of visitors outlining the proposed plan of affiliation and another trustee wrote a similar letter to the remaining visitor. These were individual letters and not sent by authority of the trustees. On May 25, 1922, the clerk of the trustees, acting in accordance with a vote of the trustees, sent to the secretary of the board of visitors, but for the information of the board, a letter transmitting an attested copy of the vote of the trustees with respect to closer affiliation with Harvard. That letter and vote called the attention of the visitors to matters of the highest importance touching the future of the seminary. While not in form a regular call to make a visita-

tion, it in substance justified a visitation provided the subject matter of the vote was within the jurisdiction of the visitors. Thereafter notice of a meeting of the visitors to be held on June 15, 1922, to hear the trustees with regard to the proposed closer affiliation was sent to the trustees. At that meeting the trustees appeared and objected to the jurisdiction of the visitors on the grounds that (1) the meeting was not a special visitation because not "regularly called," (2) the annual visitation could not be kept alive by successive adjournments, (3) the visitors had no jurisdiction of the subject matter of the plan for closer affiliation. The hearing then proceeded and the determination or decree was finally adopted unanimously.

Three individuals compose the corporation established by St. 1823, c. 50, as visitors of the theological institution. It is provided by art. XIV of the associate statutes that "a majority of the Visitors, when regularly convened, shall be a *quorum*, of which *quorum* a major part shall have power to transact the business of their Commission." The notice to the trustees of the hearing to be held on June 15, 1922, stated that a special visitation would be held for that purpose at a specified time and place. The records of the visitors seem to show that that meeting was an adjournment of the annual visitation. In view of the powers conferred upon the visitors by the associate and additional statutes, there can be an adjournment of a visitation from time to time such as is shown by the present record. *Matter of the Dean of York*, 2 Q. B. 1, 39.

It has not been argued that the notice of the hearing given to the trustees was not authorized by the visitors, or was not sufficient in form, or did not give adequate time for preparation for the hearing or was not seasonably served. No one of the individuals composing the visitors as a corporation makes any complaint as to the regularity of the meeting. According to their records, all members were present. Whether it was an adjournment of the annual visitation or a special visitation is not of vital consequence. The visitors were gathered in a meeting and for a purpose of which adequate notice had been given the trustees. Every formality

so far as concerned the real interests of the trustees had been observed. In these circumstances the trustees cannot rightly object to the meeting as a visitation.

(c) The point now raised that the meeting of June 15, 1922, was not held at the seminary is too clear for extended discussion. The trustees raised no objection on this ground at the time. Apparently the meetings were held at a place convenient to all parties.

(d) It is provided in the statutes that a member of the board of visitors shall not hold his office after reaching the age of seventy. One of the visitors reached that age on December 29, 1921, but continued to act as a member of the board until after the meeting held on May 31, 1922, when, that fact coming to the attention of the other two members, his successor was elected on June 5, 1922, and qualified on June 8, 1922. It is provided by art. XIII of the associate statutes that when any visitor shall have completed his sixty-ninth year the board shall within the year next ensuing choose some suitable person to succeed him who shall not take his seat before his predecessor shall have completed his seventieth year or resigned. There is nothing to indicate that this provision was a limitation on the power of the visitors or anything more than an expression of strong purpose which ought to be observed. Failure to conform to it is not fatal to the validity of acts performed. While there was not a strict compliance with the letter of art. XIII, those provisions according to general principles of law must be regarded as directory and not mandatory as to time. *Russell* v. *Wellington*, 157 Mass. 100, 105. *Cheney* v. *Coughlin*, 201 Mass. 204, 212, and cases there collected. *Ashley* v. *Three Justices of the Superior Court*, 228 Mass. 63, 70. Even if it be assumed that the term of office of the visitor came to an end by efflux of time on reaching the age of seventy years, the visitors as a corporation continued to function with the two remaining members. His participation in its actions came to an end before the hearing and before any decision respecting the matters here involved. See *Regina* v. *Justices of Suffolk*, 18 Q. B. 416, 421.

(e) These circumstances as to the expiration of the term

of one visitor and the election of his successor after the issuance of the notice to the trustees and before the hearing do not affect the validity of their proceedings.   The visitors constitute a corporation.   Changes in the members or officers of a corporation do not concern its corporate entity or continuity.   The visitors as a corporation continued its existence and identity regardless of shifting membership. *Phillips Academy* v. *King,* 12 Mass. 546, 554.   *Commonwealth-Atlantic National Bank of Boston, petitioner,* 249 Mass. 440.

(f)  Immediately upon receipt from the trustees of the copy of the plan of closer affiliation at a meeting held on May 31, 1922, the visitors voted to authorize counsel to take steps necessary "to protect the interests of Andover Theological Seminary" to the end that the "proposed closer affiliation between Andover Theological Seminary and Harvard University may be fully presented to the Supreme Judicial Court."   This was not a vote expressive of a determination as to the merits of that plan.   Doubtless the visitors are required to act in a judicial capacity.   They ought to be as nearly impartial as the lot of humanity will permit.   Nevertheless the visitors constitute the tribunal established by the associate and additional statutes, and by St. 1823, c. 50. No other can be substituted for it under the law.   The visitors are bound to act on their own consciences.   The proceedings respecting the hearing and determination do not appear to have been a mere matter of form.   The visitors cannot be said on this record simply to have gone through the motions of a hearing in order to register a conclusion already reached.   Doubtless they did not approach the subject with blank minds because it had been to a greater or less extent involved in some of its aspects in the 1908 plan for affiliation and because certain of the trustees had informed the visitors as individuals some months before as to the outlines of the proposed plan for closer affiliation.   All this, however, cannot be said to be prejudging the matter.   It has not been urged that there was corruption on the part of the visitors.   There is nothing to indicate that the visitors did not hear the arguments of the trustees presented at the

hearing in a judicial spirit with a purpose single to perform their duty under the trust reposed in them and without bias due to their previous action. This conclusion is supported in principle by *Correia* v. *Portuguese Fraternity of the United States*, 218 Mass. 305, 309, *Regina* v. *Hertford College*, 3 Q. B. D. 693, 703, *Hayman* v. *Governors of Rugby School*, L. R. 18 Eq. 28, 86, *In re Fremington School*, 11 Jur. 421, 424. See *Swan* v. *Justices of the Superior Court*, 222 Mass. 542, 548. The cases at bar are distinguishable on this aspect from *Thompson* v. *Catholic Congregational Society in Rehoboth*, 7 Pick. 159, and similar authorities.

2. The trustees assail the jurisdiction of the visitors to consider the plan of closer affiliation between Andover Seminary and Harvard Divinity School. They have done nothing to estop themselves from raising that point. This decision does not rest upon the practical interpretation placed upon the powers of the visitors both by them and the trustees during the time since 1808, important though that might be. *Burrage* v. *County of Bristol*, 210 Mass. 299, 301. *United States Trust Co.* v. *Commonwealth*, 245 Mass. 75, 80. *Southborough* v. *Boston & Worcester Street Railway*, 250 Mass. 234.

The plan for closer affiliation in the main was a joining of Andover Theological Seminary with Harvard Divinity School. The former was founded and had been maintained solely for the theological education of ministers of orthodox trinitarian congregationalists. The strict provisions as to the theological beliefs of her professors, and the heavy duty laid upon the visitors to inquire into these matters show how vital was regarded adherence of the institution as an entity to that denomination. The Andover creed itself was essentially a statement orthodox, trinitarian, evangelical in the strict meaning of those words at that time. It was framed by and for calvinists of that day. It embodied a part of the Westminster Assembly's Shorter Catechism. It was the creedal basis of an institution founded and promoted to combat liberalism in religion. Harvard Divinity School, for many years distinctively unitarian, had become wholly undenominational. On its faculty were unitarians and others

not adherents of any trinitarian orthodox church.  The plan of closer affiliation differs materially from the 1908 plan of affiliation in many respects, although alike in that under it both Andover and Harvard students meet in the same courses and Andover students take courses given by Harvard instructors and *vice versa.*  Approval of the 1908 plan (even if there were such approval by the visitors) would not prevent examination of the plan for closer affiliation presented in 1922.

It is difficult to conceive of a matter more obviously likely to call for the exercise of visitatorial powers than the close union of such a seminary as Andover with such a school as Harvard.  The board of visitors having the general and special powers already adverted to are charged to guard the Andover Theological Institution in all future time against all perversion or the smallest avoidance of the true design of its founders.  The visitors could hardly do less than examine the plan for closer affiliation of the seminary with Harvard to ascertain whether it conformed to the constitution and associate and additional statutes.  The powers and duties of the visitors already set forth include within their jurisdiction a matter of such importance to the seminary.

The jurisdiction of the visitors over the subject is not affected by the fact that the President and Fellows of Harvard College were not summoned before them for hearing on the validity of the plan for closer affiliation.  That body did not ask to be heard.  The visitors had no jurisdiction over Harvard College.  The trustees by making a contract with a third person manifestly cannot prevent the visitors from performing their duties.  The cases at bar are distinguishable in this respect from *Smyth* v. *Phillips Academy,* 154 Mass. 551.  The President and Fellows of Harvard College raise no such question.

3. The determination or decree made by the visitors after prefatory recitals was in these words: "1. That the said plan for closer affiliation between Andover Theological Seminary and Harvard University is inconsistent with the Associate Foundation Statutes;  2. That by the adoption of said plan for closer affiliation, between Andover Theological

Seminary and Harvard University, the said Andover Theological Seminary will be improperly managed and will not then be conducted in accordance with the principles of its foundation. The Board of Visitors of Andover Theological Seminary therefore declare void the plan for closer affiliation between Andover Theological Seminary and Harvard University as submitted to them by the Board of Trustees of Andover Theological Seminary."

It is not our province to reëxamine this decision so far as it rests upon findings of fact. The ordinary exercise of visitatorial powers, if founded upon any evidence, is not reviewed by courts. The duty of the courts touching the determination by visitors acting within their general jurisdiction is to interpose to prevent action contrary to law in the administration of the trust. The weight and effect to be given in general to the determination of the visitors of a charity are stated in *Nelson* v. *Cushing*, 2 Cush. 519, at page 530, to be "that when a general visitatorial power is provided by the founder of an eleëmosynary corporation and foundation for charity, no court of either law or equity will interfere to control or direct the ordinary exercise of such visitatorial power, subject to the limitation only, that when the visitors, in the exercise of their power, act contrary to law in a matter in effect amounting to a breach of trust, then a court of equity, under their ordinary jurisdiction, will interpose, upon the application of the attorney-general, as the representative of the public, to prevent and restrain such breach of trust." The principle generally recognized is that in all cases where a visitor has given a decision within his powers, it is final and not subject to reëxamination at law or in equity. *Attorney-General* v. *Catherine Hall*, Jac. 381, 392. *Ex parte Berkhampstead Free School*, 2 V. & B. 134, 137. *Rex* v. *Bishop of Ely*, 5 D. & E. 475, 477. *Murdock, appellant*, 7 Pick. 303, 321. *Philips* v. *Bury*, 2 D. & E. 346, 348, 353.

These principles, applied to the Andover trusts, mean that the determination of the visitors must stand, if supported by evidence, unless it is contrary to some general principle of law or to some provision of the constitution or associate or additional statutes of the seminary. This is the implica-

tion of the words of St. 1823, c. 50, § 3, to the effect that the court may intervene if the visitors "acted contrary to the statutes of the founder" or "exceeded the limits of their jurisdiction." *Murdock, appellant,* 7 Pick. 303, 323. *Nelson* v. *Cushing,* 2 Cush. 519, 530. *Smyth* v. *Phillips Academy,* 154 Mass. 551, 560, 561, 562. See *Gillard's Case,* 244 Mass. 47, 55; and *Interstate Commerce Commission* v. *Louisville & Nashville Railroad,* 227 U. S. 88, 92. The determination of the visitors has been treated in argument as if it was the equivalent of a decision as to questions of law. We treat it accordingly. The crucial facts do not appear to be in dispute. That question of law is, whether the plan for closer affiliation is contrary to the purposes of the founders expressed in the constitution and associate and additional statutes on which the Andover Seminary was established.

The principles to be followed in deciding this question are settled. The seminary is a public charitable trust for the religious education of those preparing for the Christian ministry. The main inquiry is to ascertain the purposes of the founders as expressed in the instruments signed by them. That purpose must be gathered from the words of those instruments, interpreted according to the meaning there attributed to them, and read in the light of the circumstances existing at the time they were used. There is no other test or guide by which to find the true character of a charity and its scope and its limitations. To follow any other would in effect make a new charity, rather than to execute the one already established. When that purpose is ascertained it must be given effect. The charity must be administered accordingly. The law recognizes the right of the founder of a charity to fix and define its nature. An owner of property may give it upon trust to maintain and inculcate any doctrine of Christianity or to promote and extend any particular Christian denomination by the training of ministers to preach its tenets. Such a gift constitutes a charity. The law will uphold and protect it. The obligation is imposed upon the managers of such a charity to adhere strictly to the scheme of the founders. Those who administer the charity have no right to vary, alter or change its plan. They

must execute the purpose of the founders conformably to its true intent. Their ideas of expediency or general utility in conducting the trust are of no consequence. The court, in ascertaining the purpose of the founders of charitable trusts and in performing its duty to see that they are not perverted, has no concern with the degree of public advantage likely to flow from the trust as founded, compared with some other more or less analogous purpose. We are bound by the declared purpose of the founders. It is only when that purpose has become impracticable of execution that upon proper proceedings the charity may be directed by the court into another channel under the doctrine of *cy pres.* In applying these principles to a charity established for the training of ministers of religion, manifestly not the slightest consideration can be given to the present prevalence of the religious creeds or doctrines to be taught or to our own beliefs concerning them. The nature of the institution as declared by the founders is the single end to be sought. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 1, 58. *Harvard College* v. *Society for Promoting Theological Education,* 3 Gray, 280, 301. *Jackson* v. *Phillips,* 14 Allen, 539, 591. *Attorney General* v. *Armstrong,* 231 Mass. 196, 203. *Eustace* v. *Dickey,* 240 Mass. 55, 72. *Attorney General* v. *Pearson,* 3 Meriv. 353, 400, 418, 419. *In re Weir Hospital,* [1910] 2 Ch. 124, 131, 133, 135.

Whether the decision of the visitors respecting the plan for a closer affiliation was erroneous in law requires a detailed examination of its terms and its effect upon the maintenance and administration of the seminary in accordance with the expressed design and declared purpose of its founders.

The plan of closer affiliation between the two schools was adopted in 1922. As summarized by the master, it "provides for a non-denominational theological school with a single faculty, roll of students, administration and catalog, the name of which shall be The Theological School in Harvard University, though it is provided that in all official publications it shall be described as 'formed by the affiliation of the Harvard Divinity School and Andover Theological Seminary.' It is represented in the catalog of the Theolog-

ical School in Harvard University for the academic year 1923–24 that the school is a department of Harvard University. . . . By the Agreement — Plan of Closer Affiliation — it is provided that the Trustees of Andover Seminary 'shall continue to exercise their functions under the Statutes, and otherwise, having the same control, as now, over the property, funds, chairs of instruction, and students, of Andover Theological Seminary' and that 'the Board of Visitors shall continue in the exercise of their authority and duties as defined by the provisions of the Associate Foundation and other deeds of gift.' The internal affairs of the Theological School in Harvard University are in the first instance under control of its Faculty. The method of constituting this Faculty is fixed by the agreement. The Faculty is subject to the Statutes of Harvard University — meaning the rules adopted by the corporation of Harvard University so far as they do not conflict with the provisions of the agreement. At meetings of the Faculty the President of Harvard University presides and in his absence the Dean of the Theological School. The Faculty decisions are made by a majority vote. At the meetings of the Faculty held previous to the hearings on this case less than half of those in attendance at each meeting were professors on the Andover Foundation." "Degrees in the Theological School in Harvard University are granted by the Harvard Corporation upon the recommendation of the Faculty of the Theological School. The only requirement for Bachelor's Degree (S.T.B.) is that the student shall complete three years of theological study and shall pass a general examination covering under seven heads the field of theological study. Hence a student (Andover or otherwise) may obtain this degree without taking any course given by an Andover instructor and a student (Andover or otherwise) may obtain this degree without taking any but courses given by Andover instructors, but he would not be likely to do so. The Trustees of Andover Seminary retain their right to grant at their discretion Andover degrees to Andover students. No student, however, gets an Andover degree unless he asks for it and elects to take it. The requirements for the Andover degree have not been affected

by the plan of closer affiliation. In order to obtain the Andover degree it is necessary for a student to take certain courses given by Andover professors, including Professor Evans' course in systematic theology."

The faculty of the Theological School in Harvard University in the academic year 1923–24 under the working of the plan for closer affiliation with respect to denominational connections was as follows: The president of the university was a unitarian, three of the Andover faculty were members of trinitarian congregational churches, and one a member of the orthodox branch of the Society of Friends. Three of the Harvard faculty were also trinitarian congregationalists, two unitarians, one a member of the Church of England, one ordained a priest of the Roman Catholic church but, having become a modernist, was forbidden to celebrate the mass or further to fulfil the functions of a priest, who has never severed his connections with the Roman Catholic church, but has no relations with it. Certain members of the faculty of arts and sciences of the university, whose courses, having nothing to do with matters of doctrine, are announced in the catalogue of the theological school, are also members, although seldom if ever attending the meetings of its faculty. Three of these are Episcopalians, one a Jew, one a Christian but member of no church, and two regular attendants at Appleton Chapel whose denominational connections were not found by the master. The findings of the master touching the present denominational status of the Harvard Divinity School or the theological school of Harvard are that "no denominational test is now or has been for many years imposed . . . in the choice of trustees, officers or teachers, nor in the admission of students, nor are any denominational tenets or doctrines taught to students. . . . the aim of its management has been to maintain a school in which all matters connected with theology shall be studied in as free a spirit as that in which philosophy, history and classical literature are studied in the colleges. The questions which gave rise to the division of the congregational denomination are irrelevant to the various subjects taught in the theological school, — homiletics, biblical exegesis, church history . . .—

with the exception of systematic theology. For many years prior to 1921 the teaching of systematic theology in the Harvard Divinity School had laid no stress on any creed and was as if the Westminster Shorter Catechism and the Associate Creed were nonexistent.''

The Andover Seminary at its inception was a protest against predominance of unitarianism in Harvard manifested by the election of a professor of that tendency in 1805. The differentiation in Harvard of the divinity school from the college was gradual. Its faculty was organized in 1819. During its early years and until 1880 all of its professors were unitarians, and most of its students became unitarian ministers. During this period it was known and conducted as a school for the propagation of unitarian faith. Since 1880 it has gradually changed by including in its faculty trinitarian congregationalists and those of other denominations. Apparently by 1906 if not earlier it had become entirely undenominational.

The Andover Theological Seminary was founded by Calvinists. It was made by them distinct and apart from every other theological school. Their three instruments of gift show that their convictions were settled upon definite theological denominational tenets. An undenominational theological school was foreign to their purpose and alien to their declarations. The circumstances, under which the seminary was founded, have already been narrated. Without now repeating them, it is enough to say that they show unmistakably that its original donors were actuated by a desire to nourish, strengthen and extend orthodox, trinitarian, evangelical congregationalism. All those qualifying words at that time had a signification more sharp and distinctive than now. Each of those qualifying words occurs in one or more of the instruments on which the seminary was established. Those original donors were resolute in their determination to combat liberal religious thought among congregationalists. The language of the constitution and the associate and additional statutes discloses a deep seated conviction on the part of those who signed them that the Andover

Seminary should be an instrumentality for the propagation of these distinctive theological doctrines.

The great and leading purpose of the founders was to establish a theological school for "the defense and promotion of the Christian Religion, by making some provision for increasing the number of *learned* and *able* Defenders of the Gospel of Christ, as well as of *orthodox, pious* and *zealous* Ministers of the New Testament." The teachers in the institution are required to oppose every theological error and heresy inconsistent with the Andover creed. Every professor in the seminary must be a man of sound and orthodox principles in divinity according to the system of evangelical doctrines called the Westminster Assembly's Shorter Catechism, must subscribe his belief in the Andover creed at the outset of his professorship and according to the words of the statutes must renew his fealty to it by repeating it publicly every five years. A central feature of the associate and additional statutes is the Andover creed. In the associate statutes it is "strictly and solemnly enjoined, and left in sacred charge, that every article of the above said Creed shall forever remain entirely and identically the same, without the least alteration, or any addition, or diminution." Continued belief in this creed is a test of the right to remain a professor. It is manifest under the associate and additional statutes that every Andover professor must believe sincerely, and be conscientiously convinced of the truth of these distinctive theological doctrines. It is a fair inference from the three documents on which the Andover Seminary came into existence, framed with such obvious and extreme care touching the theological beliefs of the professors, that the founders expected professors entertaining such tenets to teach them to the students. It is expressly provided in the associate statutes that each professor shall promise to "maintain and inculcate the Christian faith, as expressed in the Creed by me now repeated, together with all the other doctrines and duties of our Holy Religion."

The plan for closer affiliation with Harvard is not compatible with the foundation of the Andover Theological Seminary. The Andover Seminary was established as a

separate, distinct and independent theological school.  The instruments of gift which called it into being disclose no express or implied permission that it ever be consolidated with another kindred institution.  The joining of the seminary with another institution to form a nondenominational theological school is contrary to the avowed end and aim of the founders.  The causes and the history of the establishment of the Andover institution disclose an unmistakable primary and final purpose to found a theological school devoted exclusively to the propagation of the dogmas of a well defined religious belief.  The founders called it into existence for that single object.  The narration, already made in parts First and Second of this opinion, of the circumstances of the establishment of the Andover Seminary and of the extreme care taken by the founders to safeguard their donations against any perversion of their emphatically proclaimed purpose demonstrates that no such close affiliation as is here arranged with an undenominational school would harmonize with their project.  There was no elasticity in their statement of what they intended in certain respects. They made no provision for material changes in the religious conceptions set forth in the creed and in the Westminster Assembly's Shorter Catechism.  They declared in writing a clear design in that particular and they enjoined rigid conformity to it.  According to the constitution of the Andover Seminary every professor must maintain and inculcate the Christian faith in the fundamental and distinguishing doctrines of Christ "as summarily expressed in the Westminster Assembly's Shorter Catechism."  The associate statutes set forth the Andover creed as the test of faith for all professors.  The additional statutes also set forth the Andover creed as an addition to all that is required in the constitution.

The argument, that in the matter of doctrinal requirements there is a material inconsistency between the "constitution" and the "associate statutes" of the seminary, arising from compromise between the two groups of trinitarian congregationalists combining in its foundation, is not impressive in this connection.  The institution was in substance dedicated by all its founders to an orthodox creed.

The organization of the new theological school "with single faculty, roll of students, administration, and catalogue" is inconsistent with the associate and additional statutes of the Andover Seminary, and with principles underlying the foundation of the seminary. The professors appointed under the Andover endowment do not become professors in the new theological school until appointed by the governing boards of Harvard. No one can be and remain an Andover professor on the faculty of the new school until appointed by the authorities of Harvard. The independence of an educational institution is gone when its teachers must receive their final appointment from some outside authority. All matters under the control of the faculty are determined by a body in which professors owing any allegiance to Andover are in a minority. The courses of study and methods of instruction, being commonly under the control of the faculty, have passed out of the exclusive regulation by Andover Seminary. The educational policies outlined by the founders of Andover in their statutes have no binding authority over a majority of those now administering the affairs of the new theological school. The faculty is subject to the rules adopted by the Harvard corporation. The present arrangement of courses is such that commonly even students seeking to be and remain strictly Andover students would receive a substantial part of their instruction from Harvard professors, that is from professors who teach and emphasize no denominational tenets whatsoever. They might well receive instruction from no other professors. It is apparent that the strong tendency of the plan for closer affiliation as a practical matter is toward the complete disappearance of Andover with all its distinctive characteristics and its merger in the new theological school of Harvard.

Recommendations of students for Andover scholarships and fellowships must proceed from the faculty of the new school although the appointments are to be made by the trustees of Andover. This further accentuates the completeness of the control of the Harvard faculty over matters pertaining to Andover.

The plan of the founders of Andover was that its professors

were to be militant teachers. According to the mandate of its statutes they were not only to inculcate trinitarian orthodox principles, but they were to oppose many other varieties of religious belief there enumerated. Such contentiousness is incompatible with the nature of an undenominational school.

The plan for closer affiliation requires that Andover professors shall teach all those students of the new school who come to their classes whether they intend to become "orthodox . . . ministers" or do not intend to become ministers at all. While Andover Seminary by its constitution is open to "Protestants of every denomination," its attention in general was confined to those who intended to devote themselves to "the work of the Gospel ministry," and exercised their preference to attend a theological school devoted to the promotion of orthodox trinitarian congregationalism centralizing about the Andover creed and the Westminster Assembly's Shorter Catechism. The requirement of the plan of closer affiliation is in this respect different in kind from an arrangement for interchange of students between separate theological institutions. Standing alone this circumstance would not be decisive, but it is to be considered in connection with the other matters.

The choosing of the faculty, the courses of study, the declaration of the policy, and determinations as to the administration of the new theological school in the test of final power rest with the authorities of Harvard rather than with those of Andover: These factors constitute a delegation of power by the trustees which by the underlying trusts of the Andover Seminary can be administered by them alone.

The general effect of the plan for closer affiliation is a union of the Andover Seminary with the Harvard Divinity School so as to become a department of the university. That constitutes an institution different in nature from the one contemplated by the constitution, and associate and additional statutes of Andover.

The preliminary paragraphs of the plan for closer affiliation, to the effect that the continuity and distinct existence of the Andover Seminary shall be maintained, and that the

powers of the trustees and board of visitors shall remain and continue to be exercised, must be read and construed in connection with the succeeding paragraphs which in substance and effect place such a dominating power in Harvard as to disable the trustees and visitors of Andover in the exercise of their own free, untrammelled judgment from executing the will of its founders. This conclusion is supported by the principle laid down in several decisions. *Harvard College* v. *Society for Promoting Theological Education,* 3 Gray, 280. *Winthrop* v. *Attorney General,* 128 Mass. 258. *Morville* v. *Fowle,* 144 Mass. 109. *Cary Library* v. *Bliss,* 151 Mass. 364. *Eliot* v. *Trinity Church,* 232 Mass. 517. The case at bar upon this point hardly can be distinguished from *Harvard College* v. *Attorney General,* 228 Mass. 396. The question decided in *Dickey* v. *Trustees of Putnam Free School,* 197 Mass. 468, has no bearing upon the present issues.

This conclusion we feel compelled to reach on settled principles of law. It is not affected by the facts found by the master that there is not now the sharp difference between the orthodox or trinitarian congregationalists and the liberal or unitarian congregationalists that there was at the time the Andover Seminary was founded. There remains a fundamental difference between the two, confined to a part of the field of systematic theology. This difference for philosophical thinkers has been much softened or even obliterated. "Except as this difference is discussed historically it is irrelevant in the other branches of study which are ordinarily carried on in a theological school." A reading of the Andover creed and of the Westminster Assembly's Shorter Catechism, and giving the words used their common meaning, shows clearly that the disobedience, sin or fall of Adam constitute an important, if not an essential part of both. The master finds that "So far as the 'sin' or 'fall' of Adam is concerned . . . there is now no controversy between the orthodox or trinitarian congregationalists and the liberal or unitarian congregationalists in New England, since in New England congregationalists, whether trinitarian or unitarian, do not generally accept the account thereof in Genesis as historical."

These findings cannot abate or qualify the emphasis placed upon the Andover creed and the Westminster Assembly's Shorter Catechism in the constitution and the associate and additional statutes of the Andover Seminary.

There has been considerable argument concerning tuition and scholarships in the Andover Seminary and violations of the associate and additional statutes in these particulars. There is nothing in the plan for closer affiliation concerning tuition. There is no allegation in the pleading touching tuition. Therefore it is not before us. The details concerning scholarships are not relevant to the main issues on which these cases must turn.

The master finds that the trustees have taken all practicable measures to increase the endowment of the seminary which have in the main been unsuccessful. "There is and has been for several years, practically no prospect of any substantial additions to the endowment of the seminary . . . it would be impossible, for financial reasons, for the trustees of Andover Theological Seminary to maintain a theological school of a grade which would justify the granting of degrees without an affiliation of some kind with some other institution or institutions."

The master further finds "that, apart from doctrinal or creedal requirements, the plan of closer affiliation fulfils, as nearly as is possible under the existing conditions, the purposes for which Andover Seminary was founded"; and "that if the purposes for which the seminary was founded, so far as such purposes involve doctrinal or creedal requirements, are fulfilled if instruction in the field of theological studies in which doctrinal questions are involved is in the historical succession of New England trinitarian congregationalism, the plan of closer affiliation fulfils with respect to Andover students as nearly as possible under existing conditions the purposes for which Andover Seminary was founded. It did not appear before me that even if the purposes for which Andover Seminary was founded, with respect to doctrinal or creedal requirements, are not fulfilled if instruction in the field of theological studies in which doctrinal questions are involved is in the historical succession of

New England trinitarian congregationalism, any affiliation of Andover Seminary with any other institution would more nearly fulfil the purposes for which Andover Seminary was founded than does the plan of closer affiliation with Harvard University." This conclusion is supported by other and by subsidiary findings.

The substance of other findings of the master upon this aspect of the controversy is that there is no probability that the "Andover Seminary can affiliate with any theological school in Massachusetts other than Harvard, that there is little if any probability that it could affiliate with any other such school by removing from Massachusetts [forbidden by Prov. St. 1780, c. 15, § 10, 5 Prov. Laws, 1421]; that Massachusetts is and has been since Colonial times the leading congregational State in the sense that there are here many more congregational churches than in any other State and that the maintenance here of a strong theological school is of peculiar importance at the present time"; that for practical purposes there are now no acute divergencies between trinitarian and unitarian congregationalists, that the existing difference is confined to a part of a single theological field having only a historical aspect so far as concerns theological instruction. These findings do not go to the extent of showing that the plan of closer affiliation is in conformity to the purposes of the founders of the Andover Seminary. Doctrine and creedal requirements were of the essence of the purpose of the founders of the Andover Seminary. With respect to those doctrinal and creedal requirements the founders did not contemplate changes in those respects in the historical succession of trinitarian congregationalism. Their views as expressed in the "Constitution" and the "Associate Statutes" as to doctrine and creed were immutable. The founders looked forward to no such modifications. On the contrary the associate founders enjoined that every article of the creed "forever remain entirely and identically the same, without the least alteration."

All these facts have no decisive bearing upon the questions here presented for decision. The question presented is quite different from what it would be if the seminary had been

founded simply or in substance for the training of orthodox trinitarian congregational ministers.  Doubtless if that had been the foundation, the seminary rightly could be administered according to the beliefs of those "in the historical succession of New England trinitarian congregationalism." If it has become impracticable to execute the charitable trusts established expressly in writing with respect to the Andover Seminary, that fact does not authorize the trustees to make a different disposition of the charity.  The trustees cannot rightly depart from the trusts established.  The doctrine of *cy pres* can be administered only by a court of equity and not by the managers of a charity.  *MacKenzie* v. *Trustees of the Presbytery of Jersey City,* 1 Rob. 652, 671.  *Lakatong Lodge* v. *Franklin Board of Education,* 14 Buch. 112, 116.  *In re Campden Charities,* 18 Ch. D. 310, 328, 329, 330.  Tudor on Charities (4th ed.) 490.

It may be that in the light of these findings the founders were unwise, and that it would have been sounder policy to have made a charitable foundation less hedged about with restrictions and with freer hand in the managers to adapt the charity to changed conditions as decades come and go. Such considerations have no relevancy to the questions here to be decided.  We can only interpret and apply the charity as it was founded according to the terms of the gift and the words of the founders.

The argument of the trustees that relief ought to be denied because of changed conditions, based on cases like *Jackson* v. *Stevenson,* 156 Mass. 496, and *Loud* v. *Pendergast,* 206 Mass. 122, has no relevancy whatever to the situation here disclosed.  The doctrine, that a public charity, no longer capable of practical administration according to its foundation, can be changed to a new purpose under the doctrine of *cy pres* alone, is too well settled to require discussion.

If it has become impracticable to carry out the Andover trusts, application may be made to the court for the formulation of a scheme for their administration under the doctrine of *cy pres.*  None of the cases at bar are directed to the invocation of that doctrine.  Hence we cannot deal with that subject on these records.

It has been urged with earnestness that the visitors are disabled from raising the question as to the validity of the plan for closer affiliation because of the plan of affiliation of 1908 which they have not disapproved and which has been in operation so long as to render any attack upon it now an injustice. The plan for affiliation of 1908 is not before us for consideration. The master finds that the plan of closer affiliation differs materially from the previous plan of affiliation in many respects, although resembling it in others. Critical comparison of the two plans demonstrates that this finding is right. Without taking time to state the points of divergence and resemblance, it is enough to say that they are so far different in substance that approval of the earlier plan does not as matter of logic, or of judicial impartiality require approval of the latter.

The trustees point to various instances where in past years the visitors have relaxed from strict adherence to the requirements of the associate and additional statutes. These relate to requirement of subscription to the creed without qualification by professors and in other matters. All these matters, giving them collective force, are not enough to bar the visitors from asserting the position which they here take. We need not consider whether circumstances might arise which would work something in the nature of an estoppel against the visitors. Generally it is true that no length of time of diversion from the plain provisions of a charitable foundation will prevent its restoration to its true purpose. The practical construction put upon a charitable foundation of doubtful meaning by those charged with its administration through many years is entitled to great weight in ascertaining its right construction. Here the words establishing the charity are clear. The purpose of the founders is expressed with lucidity. No reason is shown why the trust should now be administered by the trustees of their own motion in a manner so divergent from its terms as originally established. *Attorney General* v. *Rochester,* 5 De G. M. & G. 797, 822. *Attorney General* v. *Beverley,* 6 De G. M. & G. 256, 268. *Attorney General* v. *St. John's Hospital,* 2 De G. J. & S. 621. *Church of Christ* v. *Reorganized Church,* 17

C. C. A. 397.   *Drummond* v. *Attorney General*, 2 H. L. C. 837, 861.

The cases have been decided on the pleadings and as presented in argument.   Kindred, cognate or allied questions need not be discussed or considered.

The question whether the doctrine of *cy pres* may be invoked upon the facts disclosed in the master's report is not raised on the present pleadings; and the question whether amendment to that end ought to be allowed also is not before us.

Fourth.   The conclusion which we have reached may render immaterial some or all of the visitors' exceptions to evidence.   Nevertheless no error is disclosed in any of the rulings to which they excepted.   Large questions affecting an important public charity were involved.   Whether it was practicable to administer that charity in conformity to its foundation in the light of change in doctrinal positions and creedal beliefs or the importance attributed to them, and the determinations of the visitors from time to time as to precise adherence to the terms of the associate and additional statutes, had a bearing, although somewhat remote, upon the real nature of the charity.   At all events this is one of the cases where the court is not inclined to sustain exceptions as to evidence where its admission does not appear to be plainly wrong.   *Sargent* v. *Merrimac*, 196 Mass. 171, 175, 176. *Jeddrey* v. *Boston & Northern Street Railway*, 198 Mass. 232, 235.

Evidence as to relaxation by the visitors of the strictness of unqualified subscription to the Andover creed by professors and repetition of its words and other matters of this nature was pertinent on the same ground and stands on the same footing in law.

There is no merit in the exceptions by the trustees to the exclusion of evidence.   Evidence of teachings from time to time in the Andover Theological Seminary and writings, statements and conduct indicating strongly disbelief by various professors and others interested in the seminary in parts of the Andover creed have no relevancy to the issues here depending.   Evidence that there were no educational

institutions in New England which would accept the Andover trusts subject to the doctrinal restrictions also was not germane to the present inquiry. The opinion of various writers and church or ecclesiastical meetings concerning the merits of the plan for closer affiliation also were impertinent to questions here to be decided. Without further discussion or statement, all the exceptions as to evidence are overruled.

Fifth. Form of Procedure and Relief.

The three cases are rightly here.

1. The appeal of the trustees from the determination or decree of the visitors is expressly authorized by St. 1823, c. 50, § 3. Two such appeals have hitherto come before this court and have been entertained and decided. *Murdock, appellant,* 7 Pick. 303. *Smyth* v. *Phillips Academy,* 154 Mass. 551.

2. The suit by the trustees against the visitors seeking to set aside the determination or decree declaring void the plan of closer affiliation and to restrain the visitors from further interference with the execution of that plan appears to be sanctioned and perhaps may be supported by the principles of *Eaton* v. *Eaton,* 233 Mass. 351, 364, and *Eustace* v. *Dickey,* 240 Mass. 55, 60, 86. See however *Smyth* v. *Phillips Academy,* 154 Mass. 551, where the Attorney General was made a party. Since this bill must be dismissed, there is no objection to stating the grounds of substantive law which support that result. *Commonwealth* v. *McNary,* 246 Mass. 46, 48, and cases there collected.

3. The suit by the visitors against the trustees, the President and Fellows of Harvard College and the Attorney General is not open to attack by demurrer. It states a case for equitable relief. The powers and duties of the visitors are bounded by the statute creating them a corporation. That statute in turn by reference embodies "the terms and conditions prescribed by the Statutes of the Founders" of the theological institution "agreeably to the intentions of the founders," and expressly confers upon the visitors power to "do and perform all acts and things required of them by such statutes." The visitors, therefore, have not only general visitatorial power but also certain additional special powers

set out in detail in the statutes of the founders.   Manifestly the fundamental purpose of the founders was to secure and maintain in the administration and teaching of the theological institution adherence to the creed set forth both in their associate and additional statutes and to the theological doctrines there described.   The establishment of visitors is stated to be to the end that the trusts for the theological seminary "may be always executed agreeably to the true intent of this our Foundation; and that we may effectually guard the same in all future time against all perversion, or the smallest avoidance of our true design."   Then, after the enumeration of many specified powers and duties, the visitors are charged "in general, to see that our true intentions, as expressed in these our Statutes, be faithfully executed." These powers are broad enough to enable the visitors to invoke the aid of a chancery court in a case like the present to enforce conformity to the intentions of the founders with respect to the theological institution.   Instances might arise where the only avenue open to the visitors to enforce observance of the intentions of the founders would be by resort to a court.   Even though this power is not expressly conferred by St. 1823, c. 50, it is implied in the ample grant of corporate authority and obligation there contained.   The visitors have a public or official duty resting on them in this particular.   *Kline* v. *Shapley,* 232 Mass. 500.   *Monroe* v. *Cooper,* 235 Mass. 33, 34.   *Ayer* v. *Commissioners on Height of Buildings in Boston,* 242 Mass. 30, 33.   Of course a defendant ought not to be harassed with unnecessary litigation. *Spear* v. *Coggan,* 223 Mass. 156.   *Consolidated Ordnance Co.* v. *Marsh,* 227 Mass. 15.   The visitors have brought only one suit.   The President and Fellows of Harvard College in their own right and the Attorney General representing the interests of the general public have or may have an interest in some aspects of the present controversy.   They have been made parties to the suit brought by the visitors.   In view of the special powers and duties of the visitors in connection with the general visitatorial functions, this is not one of the numerous cases illustrated by *Burbank* v. *Burbank,* 152 Mass. 254, *Attorney General* v. *Bedard,* 218 Mass. 378, 385, and *Krauthoff*

v. *Attorney General*, 240 Mass. 88, 92, where the Attorney General alone is authorized to institute proceedings to enforce a public charitable trust. In the peculiar circumstances of the present parties and their unusual interests and rights, it cannot be said that the suit of the visitors cannot be maintained. What is sought is not a mere declaratory decree and the principle of *Hanson* v. *Griswold*, 221 Mass. 228, is not applicable. It follows from what has been said, without further discussion, that the grounds of demurrer as set out in the several answers to the suit brought by the visitors are not well taken and are overruled.

4. The visitors ask that the act of affiliation of Andover Theological Seminary with Harvard College adopted on March 12, 1908, be declared void. The visitors after hearing by majority vote "determined and adjudged that in removing the seminary to Cambridge the Trustees did not act contrary to the intention of the founders of the seminary," but claimed and reserved "a right to examine and pass upon the practical working of the scheme of affiliation with Harvard University when it shall fully develop." One member of the board of visitors filed a dissent setting forth in plain words the clear reasons, which led his mind to the firm conviction that the proposed affiliation was a perversion of the trust. But under the provisions of art. XIV of the associate statutes the vote of the majority prevailed. That vote was not in terms an unequivocal determination for or against that affiliation. Whether that affiliation was an execution of the trust "agreeably to the true intent of this our Foundation," or contrary thereto was directly brought to the attention of the visitors. The opinion of the dissenting member categorically answers the question in the negative. Nevertheless the question, whether under the circumstances that determination of the majority of the visitors may be treated as an unrevoked approval of that plan of affiliation, is not before us and need not be decided. Whether the attempted reservation of matters for future consideration in its context means no more than that the detailed working of the plan might develop inconsistencies with the purpose of the founders and as to such if found they would undertake to

exercise visitatorial powers, also is a question which need not be considered.

On another ground, this position of the visitors is unsound. If their determination as to the 1908 plan of affiliation be treated as equivocal, the subject was within their jurisdiction in the first instance. They have no right to ask the court to perform their duties or to decide questions which the founders required them to decide. While the visitors have a right to invoke the aid of the court in enforcing the determinations made by them within the scope of their power, they have no general right to invoke the aid of the court against what are alleged in pleadings to be an improper use of the trust. It is the prerogative of the Attorney General as representing the public to institute proceedings of that nature. *Krauthoff* v. *Attorney General,* 240 Mass. 88, 92, and cases there cited. *Attorney General* v. *Armstrong,* 231 Mass. 196, 203. *Attorney General* v. *Bedard,* 218 Mass. 378, 385. This prayer for relief must be denied. It is not necessary to inquire whether on general principles of chancery jurisprudence the visitors may be barred of inquiry into that earlier plan by delay and *quasi* acquiescence in it. *Conners* v. *Lowell,* 246 Mass. 279, 285, and cases there collected. *Byfield* v. *Newton,* 247 Mass. 46, 59, and cases there collected. *Lang* v. *Purves,* 15 Moore P. C. 389.

The conclusion is that we feel bound to say that the determination of the visitors to the effect that the plan for closer affiliation violates the principles of the foundation and associate statutes of Andover cannot be pronounced contrary to law.

The costs of the visitors taxed as between solicitor and client are to be paid out of the general funds of the trustees of the Andover Theological Seminary. This seems to be provided for in art. XXXIII of the constitution and in art. XXIV of the associate statutes. Apart from those provisions under general chancery principles applicable to visitors of charitable foundations the same result must be reached. The visitors hold no funds. They were performing a gratuitous duty imposed on them by the founders of the institution. *Attorney General* v. *Catherine Hall,* Jac. 381, 401, 402. *Case*

*of Queens College, Cambridge,* Jac. 1, 47. *Attorney General*
v. *Price,* 3 Atk. 108.

In the suit by the visitors against the trustees and Harvard
College, decrees are to be entered overruling the demurrers,
overruling exceptions to and confirming the master's report,
and declaring the plan for closer affiliation void and enjoin-
ing the trustees and the President and Fellows of Harvard
College from further executing it.   In this suit costs to the
visitors adequate to cover their just disbursements including
counsel fees in all three of the cases are to be taxed as be-
tween solicitor and client to be paid by the trustees.   In the
suit in equity by the trustees against the visitors, decree is
to be entered confirming the master's report and dismissing
the bill.   The appeal of the trustees under St. 1823, c. 50, is
to be dismissed and the determination of the visitors is to
stand.   The details and form of the decrees in each of the
three cases are to be settled by a single justice.

*Ordered accordingly.*